# EXHIBIT A

# YOUR

## COMMERCIAL POLICY

## ISSUED BY

# Harco National Insurance Company

**A Stock Company**

**Address:**

**4200 Six Forks Rd, Suite 1400**
**Raleigh, NC 27609**
**(800)525-7486**

**A Member of:**



IN WITNESS WHEREOF, the Company has caused the facsimile signatures of its President and Secretary to  be affixed hereto, and caused this policy to be signed on the Declarations Page by an authorized representative of the Company.

**Secretary**                              **President**

PIL 20 21 12 20

# TERRORISM COVERAGE NOTICE

Coverage for acts of terrorism is included in your policy.

You are hereby notified that the Terrorism Risk Insurance Act, as amended in 2019, defines an act of terrorism in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is $ included with your premium and does not include any charges for the portion of losses covered by the United States government under the Act.

**NOTICE TO STANDARD FIRE STATE POLICYHOLDERS:** In certain states ("standard fire states"), a terrorism exclusion makes an exception for (and thereby provides coverage for) fire losses resulting from an act of terrorism. Coverage for such fire losses will be provided in your policy, subject to all other policy terms, conditions and exclusions.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004

**PIL 20 32 01 23**

# CALIFORNIA FRAUD STATEMENT

For your protection, California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

# Notice of Privacy Policy
## IAT Insurance Group

ACCEPTANCE CASUALTY INSURANCE COMPANY * ACCEPTANCE INDEMNITY INSURANCE COMPANY *
COMMERCIAL ALLIANCE INSURANCE COMPANY * IAT RE * HARCO NATIONAL INSURANCE COMPANY *
OCCIDENTAL FIRE & CASUALTY COMPANY OF NC * SERVICE INSURANCE COMPANY * TRANSGUARD
INSURANCE COMPANY * WILSHIRE INSURANCE COMPANY

This notice is from the member companies of IAT Insurance Group ("IAT") listed above.   IAT values you as a customer and respects your right to privacy.   We also respect your right to keep your personal information confidential and to avoid unwanted solicitations.   In the course of our business relationship with you, we collect information about you that is necessary to provide you with our products and services.   We treat this information as confidential and recognize the importance of protecting it.   This notice describes our privacy practices regarding information about our customers and former customers that obtain financial products or services from us.

## Information We May Collect

We collect information about you to provide you with the coverage, product, or service you request and to service your account.   The information ("nonpublic personal information") we collect about you and members of your household ("you") is generally from the following sources:

- Information we receive from you on applications or other forms, such as your address, telephone number, driver's license number, and social security number;
- Information about your transactions with us and our affiliates, such as your payment history, policy coverage, and premiums;
- Information we receive from a consumer report agency or insurance support organization, such as driving records, credit report information, and claim history; and
- Information from your visits to iatinsurance.com or other websites we operate, use of our social media sites, and interactions with our online advertisements.

## Information Disclosure

In order to better serve you and to assist in meeting your product and service needs, we share our information about your insurance transactions and experiences with companies related to us by common control or ownership and with our network of agents.   We may also disclose information about you to financial institutions and companies that perform marketing services for us or with whom we have joint marketing agreements, as permitted by law.   Additionally, we may share information as necessary to handle your claims and to protect you against fraud and unauthorized transactions.   We do not disclose any nonpublic personal information about you to any third parties, except as described in this notice or otherwise permitted by law.

## Security of Information

We also take steps to safeguard your information.   We maintain physical, electronic, and organizational safeguards to protect your information.   We also restrict access to your information to those employees and other parties who have a need to know that information, in order to provide products or services to you.

If a material change is made to this Notice, a revised version of the Notice of Privacy Policy will be made available to you.   We sincerely appreciate your continued business.



PR Notice 01 18



**Harco National Insurance Company**
4200 Six Forks Rd, Suite 1400, Raleigh, NC, 27609
(800)525-7486

# GENERAL TERMS AND CONDITIONS DECLARATIONS

**Policy Number:  PML0002157 01**

| Producer: ███████████ |
|---|

| NOTICE |
|---|
| THE LIABILITY COVERAGE PARTS AND CYBER COVERAGE PART LIABILITY INSURING AGREEMENTS PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY APPLICABLE TO JUDGMENTS AND SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  PLEASE READ THIS POLICY CAREFULLY. |

| Item 1. | **Named Insured and Address:** |
|---|---|
| | Wayfarer Studios,<br>417 S Beverly Dr,<br>Beverly Hills, CA 90212-4409 |

| Item 2. | **Policy Period:** | 07-15-2024 | to | 07-15-2025 | 12:01 a.m. local time at address in Item **1.** |
|---|---|---|---|---|---|

| Item 3. | **Notices to Insurer:** | |
|---|---|---|
| | **Claims and Potential Claims:** | |
| | *By 24 hours toll free* | 866-576-7971 |
| | *By 24 hours toll free (Cyber)* | 844-987-0678 |
| | *By Email* | new.loss@iatinsurance.com |
| | *By Email (Cyber)* | iat.breachhotline@mullen.law |
| | *By Fax* | 919-834-0855 |
| | *By Mail* | PO Box 17449, Raleigh, NC 27619-7449 |
| | **All Other Notices:** | |
| | *By 24 hours toll free* | 866-576-7971 |
| | *By 24 hours toll free (Cyber)* | 844-987-0678 |
| | *By Email* | new.loss@iatinsurance.com |
| | *By Email (Cyber)* | iat.breachhotline@mullen.law |
| | *By Fax* | 919-834-0855 |
| | *By Mail* | PO Box 17449, Raleigh, NC 27619-7449 |

# GENERAL TERMS AND CONDITIONS
# DECLARATIONS *(continued)*

| | | |
|---|---|---|
| **Item 4.** | **Extended Reporting Period and Premium Percentage Charge for Liability Coverage Parts:** | |
| | A.  Period: 1 year | 100% |
| | B.  Period: 2 years | 125% |
| | C.  Period: 3 years | 175% |

| | |
|---|---|
| **Item 5.** | **Purchased Coverage Parts**: |
| | A. **Liability Coverage Parts:** |
| | Directors & Officers Liability, Employment Practices Liability |
| | B. **Other Coverage Parts:** |

| | | |
|---|---|---|
| **Item 6.** | Combined Aggregate Limit of Liability for all **Liability Coverage Parts** combined (including **Defense Costs**): | |
| | [ ] Yes    [X] No | $  Not Applicable |

| | | |
|---|---|---|
| **Item 7.** | **Coverage Premium** | $ ██████ |
| | Other Charges: | $  0.00 |
| | **Total Policy Premium:** | $ ████████ |

| | |
|---|---|
| **Item 8.** | Form(s) and Endorsement(s) made a part of this policy at time of issue*: |
| | **See SCHEDULE OF FORMS AND ENDORSEMENTS – PIL 10 10** |

These Declarations, along with the completed and signed **Application**, the policy forms and any written endorsements attached thereto shall constitute the contract between the **Insureds** and the Insurer.

**POLICY NUMBER:** PML0002157 01

PIL 10 10 08 18

# SCHEDULE OF FORMS AND ENDORSEMENTS

Insured Name:  Wayfarer Studios

Form(s) and Endorsement(s) made a part of this policy at time of issue:

| | | |
|---|---|---|
| PIL00010818 | - | COMMERCIAL LINES POLICY JACKET |
| PIL20211220 | - | TERRORISM COVERAGE NOTICE |
| ILP0010104 | - | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL  (OFAC) ADVISORY NOTICE TO POLICYHOLDERS |
| PIL20320123 | - | CALIFORNIA FRAUD STATEMENT USAGE |
| PRNotice0118 | - | NOTICE OF PRIVACY POLICY |
| PML00010820 | - | GENERAL TERMS AND CONDITIONS DECLARATIONS |
| PIL10100818 | - | SCHEDULE OF FORMS AND ENDORSEMENTS |
| PML00020420 | - | DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART DECLARATIONS |
| PML00040420 | - | EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART DECLARATIONS |
| PML10000420 | - | GENERAL TERMS AND CONDITIONS - PRIVATE COMPANY |
| PML00030420 | - | DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART - PRIVATE COMPANY |
| PML00050420 | - | EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART - PRIVATE COMPANY |
| PML12900421 | - | THIRD PARTY WRONGFUL ACT DEFINITION AMENDED (THIRD PARTY HARASSMENT AND THIRD PARTY DISCRIMINATION) ENDORSEMENT |
| PML10280420 | - | CRISIS EVENT EXPENSES COVERAGE ENDORSEMENT (EPL) |
| PML10770420 | - | WORKPLACE VIOLENCE EXPENSES ENDORSEMENT |
| PML11680420 | - | ADDITIONAL DEFENSE COSTS SEPARATE LIMIT |
| PML10511022 | - | ILLEGAL IMMIGRANT INVESTIGATIVE DEFENSE COSTS SUBLIMIT AND SEPARATE RETENTION ENDORSEMENT |
| PML12940921 | - | BIOMETRICS EXCLUSION ENDORSEMENT |
| PML11020420 | - | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| PML12411020 | - | ABSOLUTE BODILY INJURY EXCLUSION - PRIVATE COMPANY |
| PML12951022 | - | DEFENSE, COOPERATION AND CONSENT AMENDED ENDORSEMENT |
| PML12961022 | - | INSURED VS. INSURED EXCLUSION AMENDED ENDORSEMENT (INCLUDING CREDITORS COMMITTEE CARVEBACK) - PRIVATE COMPANY |
| PML11780420 | - | CALIFORNIA CHANGES |
| PML M0 01 07 23 | - | WAGE AND HOUR SUBLIMIT AND SEPARATE RETENTION INCLUDING LOSS FOR CLASS ACTIONS ENDORSEMENT |
| PML M0 02 07 23 | - | ABUSE OR MOLESTATION EXCLUSION ENDORSEMENT –(EPL) |
| PML M0 03 07 23 | - | MEDIA AND BROADCASTING SERVICES EXCLUSION ENDORSEMENT – PRIVATE COMPANY |



# DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART DECLARATIONS

**POLICY NUMBER: PML0002157 01**

**MANAGEMENT LIABILITY
PML 00 02 04 20**

| NOTICE |
|---|
| **THIS LIABILITY COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY APPLICABLE TO JUDGMENTS AND SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  PLEASE READ THIS POLICY CAREFULLY.** |

**Item 1.  Named Insured:** Wayfarer Studios

**Item 2.** Aggregate Limit of Liability (including **Defense Costs**):  $ 2,000,000

**Item 3.** Side A Additional Limit of Liability:  $ 1,000,000

**Item 4.** Coverage Extensions Sublimits of Liability:

Not Applicable means the Coverage Extension is not included in the coverage provided and such provision does not apply.

   A.  **Demand Response Costs**  $ 250,000

   B.  **Crisis Event Expenses**  $ 75,000

**Item 5.** Retention:

   Insuring Agreement **B.**  $ 25,000  Each **Claim**

   Insuring Agreement **C.**  $ 25,000  Each **Claim**

**Item 6.** Pending or Prior Litigation Date:  07-15-2023

These Declarations, along with the completed and signed **Application**, the policy forms and any written endorsements attached thereto shall constitute the contract between the **Insureds** and the Insurer.



# EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART DECLARATIONS

**POLICY NUMBER: PML0002157 01**

**MANAGEMENT LIABILITY**
**PML 00 04 04 20**

| NOTICE |
|---|
| **THIS LIABILITY COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY APPLICABLE TO JUDGMENTS AND SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.** |

| | | |
|---|---|---|
| **Item 1.** | **Named Insured:** Wayfarer Studios | |
| **Item 2.** | Aggregate Limit of Liability (including **Defense Costs**): | $ 2,000,000 |
| **Item 3.** | Retention: | |
| | A. Each **Claim** other than a **Class Action** | $ 50,000 |
| | B. Each **Class Action** | $ 50,000 |
| **Item 4.** | Pending or Prior Litigation Date: | 07-15-2023 |

These Declarations, along with the completed and signed **Application**, the policy forms and any written endorsements attached thereto shall constitute the contract between the **Insureds** and the Insurer.

# GENERAL TERMS AND CONDITIONS - PRIVATE COMPANY

In consideration of the premium, and in reliance upon the **Application**, the Insurer and the **Insureds** agree as follows:

## I.    PREFACE

A Coverage Part is included within this Policy and affords coverage only if the Coverage Part is listed in Item **5.** of the General Terms and Conditions Declarations as purchased.

These General Terms And Conditions shall only apply to **Liability Coverage Parts**.

The terms and conditions in each Coverage Part apply only to such Coverage Part and will not apply to any other Coverage Part.

If any provision in these General Terms and Conditions is inconsistent with the terms and conditions of any applicable Coverage Part, the terms and conditions of such Coverage Part will control.

Bolded terms in this Policy will have the special meaning as set forth in the definitions in these General Terms and Conditions and in the respective Coverage Part.  If used in this policy the words "you" and "your" refer to the **Named Insured** shown in the Declarations, and any other person or organization qualifying as a **Named Insured** under this policy.  The words "we", "us," "our" and "Insurer" mean the insurance company named in the General Terms and Conditions Declarations.

## II.    SUPPLEMENTARY BENEFITS

**A.**  Mediation Retention Reduction

If, prior to or within sixty (60) days after a covered **Claim** is made against the **Insureds**, the claimant and the **Insured** (with the consent of the Insurer) agree to use a non-binding alternative dispute resolution process to resolve such **Claim**, and if such **Claim** is entirely resolved through such process, then the Retention applicable to any **Loss** arising from such **Claim** shall be reduced by the lesser amount of fifty percent (50%) of such Retention or ten thousand dollars ($10,000).

**B.**  Attendance Expenses Reimbursement

If the Insurer requests an **Insured Person's** presence at a trial, hearing, deposition, mediation or arbitration, the Insurer will pay up to five hundred dollars ($500) per day, per **Insured Person** for reimbursement of costs and expenses incurred in connection with such presence, subject to a maximum of five thousand dollars ($5,000) per **Claim** for all **Insured Persons** combined.  Such payment will be in addition to the applicable Limit(s) of Liability and no Retention will apply with respect to such payment.

**C.**  Pre-Claim Expenses

In the event a **Noticed Matter** later gives rise to a covered **Claim**, then the **Pre-Claim Expenses** incurred by the **Insureds** in connection with such **Noticed Matter** shall reduce up to ten percent (10%) of any Retention applicable to such **Claim**.

## III.    DEFINITIONS

When used in this Policy, the following terms, whether in the singular or plural, are defined as follows:

**Application** means all materials and information, including all signed applications and any materials attached thereto or incorporated therein, submitted by or on behalf of the **Insureds** to the Insurer in connection with the underwriting of this Policy or any policy issued by the Insurer of which this Policy is a direct or indirect renewal or replacement.

**Assumed Liability** means an **Insured's** voluntary assumption of the liability of others undertaken by the **Insured** in any oral or written contract or agreement, unless such liability would have attached to the **Insured** in the absence of such contract or agreement.  **Assumed Liability** does not include liability

assumed in accordance with or under the trust instrument or equivalent documents governing the assets of the **Plan**.

**Bodily Injury** means any actual or alleged bodily injury, sickness, disease, death, emotional distress or mental anguish of any natural person.

**Change of Control** means when: **(i)** the **Named Insured** merges into or consolidates with another entity and is not the surviving entity; **(ii)** another person or entity or group of persons or entities acting in concert acquires **Management Control** of the **Named Insured**; or **(iii)** the **Named Insured** emerges from bankruptcy.

**Clean-Up Costs** means any fees, costs or expenses, including legal and professional fees, incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

**Conduct** means:  **(i)** the **Insured's** gaining of profit or other financial advantage to which the **Insured** was not legally entitled; or **(ii)** the **Insured's** commission of a deliberate crime, deliberate fraud or a deliberate dishonest act or omission or willful violation of any law or regulation; provided the gaining of such profit or advantage or the commission of such conduct is established by a final non-appealable adjudication in the underlying proceeding and not in a proceeding by or against the Insurer.

**Defense Costs** means that part of **Loss** consisting of reasonable costs, fees (including but not limited to attorney's fees and expert's fees) and expenses (other **Overhead Expenses**) incurred by the **Insureds** **(i)** in defending or investigating **Claims**, including costs assessed against the **Insureds** in a **Claim** or the premium for appeal, attachment or similar bonds, provided the Insurer shall have no obligation to apply for or furnish such bonds, or **(ii)** at the Insurer's request to assist the Insurer in investigating a **Claim**. Except with respect to any **Pre-Claim Expenses** described in Section **II.C.** of these General Terms and Conditions, this Policy does not cover any fees, costs or expenses incurred on account of a **Claim** prior to the time the **Claim** is first made against the **Insured**.

**Employee** means any natural persons who have served, now serve or shall serve in any of the following positions, other than an **Executive**:

1.  any natural persons in the regular service of an **Insured Entity** in the ordinary course of the **Insured Entity's** business and whom the **Insured Entity** compensates by salary, wage and/or commissions and has the right to govern and direct in the performance of such service, including any such natural persons who are leased, temporary, part-time or seasonal employees of the **Insured Entity**;

2.  any natural person independent contractors who are treated under applicable law as employees of the **Insured Entity**; and

3.  any volunteers of the **Insured Entity**;

    provided any coverage for any such leased employees or independent contractors shall be specifically excess of any indemnification or insurance otherwise available to such leased employees or independent contractors from the applicable leasing company or any other source.

**ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments thereto as contained in the Consolidated Omnibus Budget Reconciliation Act of 1985 and the Health Insurance Portability and Accountability Act of 1986), any similar statutory or common law anywhere in the world (including the English Pensions Act of 1995) or any rule or regulation promulgated under any such laws, all as amended.

**ERISA Violation** means any actual or alleged violation of **ERISA**.

**Executive** means any natural person:

1.  past, present or future duly elected or appointed director (including a shadow or de facto director), trustee (excluding a bankruptcy or litigation trustee), advisory board member, officer, governor or **Manager** of an **Insured Entity**;

2.  past, present or future In-House General Counsel or Risk Manager of the **Named Insured**;

3.  holder of a functionally equivalent position to those included in paragraph **1.** or **2.** above; or

4. holder of a functionally equivalent position to those included in paragraph **1.**, **2.** or **3.** above while serving in an **Outside Position**.

**Executive Officer** means the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, the General Counsel, the Risk Manager or any functionally equivalent positions in the **Named Insured**.

**Extended Reporting Period**, if purchased, means the time period of the extended coverage under the **Liability Coverage Parts**, as described in Section **V.** of these General Terms and Conditions.

**Extradition** means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country for trial, or otherwise to answer any criminal accusation, for a **Wrongful Act**.

**Financial Insolvency** means: **(i)** the appointment by a federal, state or local agency or court of a receiver, conservator, liquidator, trustee, rehabilitator or similar official, to take control of, supervise, manage or liquidate an **Insured Entity**; **(ii)** an **Insured Entity** becoming a debtor in possession under United States bankruptcy law or any equivalent foreign bankruptcy law; or **(iii)** an **Insured Entity** being unable to pay its debts in the ordinary course of business.

**Independent Contractor** means any natural person who is not an **Employee** and who is working for an **Insured Entity** in the capacity of an independent contractor pursuant to an express contract or agreement with the **Insured Entity** which governs the nature of such person's engagement.

**Insured Entity** means the **Named Insured** or any **Subsidiary**, including any such entity as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

**Insured Person** will have the meaning designated in the respective Coverage Part.  With respect to any **Liability Coverage Part**, **Insured Person** will also include any deceased or legally incompetent **Insured Person's** assigns, estates, heirs or legal representatives or an **Insured Person's** spouse or domestic partner, but only for a **Claim** arising solely out of their status as such and, in the case of a spouse or domestic partner, where such **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured Person** to the spouse or domestic partner.  There will be no coverage afforded under this Policy for any act, error or omission of any such assign, estate, heir, legal representative, spouse or domestic partner.

**Liability Coverage Part** means those Coverage Parts set forth in Item **5.A.** of the General Terms and Conditions Declarations.

**Management Control** means:

1. owning or controlling more than fifty percent (50%) of the outstanding securities, shares or equity ownership of an entity representing the present right to vote for the election of, or to designate or appoint, the directors, trustees, **Managers** or equivalent executives of such entity; or

2. having the present right, pursuant to a written contract with or an organization document of an entity, to elect, designated or appoint the majority of the directors, trustees, **Managers** or equivalent executives of such entity.

**Manager** means any natural person who was, is or shall become a manager, managing member, general partner, member of the board of managers or equivalent executive of an **Insured Entity** that is a limited liability company or limited partnership.

**Named Insured** means the entity set forth in Item **1** of the General Terms and Conditions Declarations.

**Noticed Matter** means any written notice of circumstance described in Section **VI.B.** of these General Terms and Conditions which the Insurer accepts under a **Liability Coverage Part**.

**Other Coverage Part** means those Coverage Parts set forth in Item **5.B.** of the General Terms and Conditions Declarations.

**Overhead Expenses** means the salaries, wages, fees, overhead or benefit expenses associated with any **Insured**.

**Pending or Prior Litigation** means any proceeding, investigation or written demand against an **Insured** pending on or prior to the date set forth in the respective Coverage Part's Declarations, or the same or substantially the same **Wrongful Acts**, facts or circumstances alleged in or underlying such proceeding, investigation or demand.

**Policy Period** means the time period from the inception date to the expiration date of this Policy as set forth in Item **2.** of the General Terms and Conditions Declarations, subject to its earlier termination or cancellation as provided in Section **XI.** of these General Terms and Conditions. **Policy Period** will also include the **Extended Reporting Period**, if purchased.

**Pollutants** means any actual or alleged: **(i)** solid, liquid, gaseous, thermal or radioactive irritant or contaminant, acids, alkalis, chemicals, fumes, smoke, soot, vapor, waste or waste materials to be recycled, reclaimed, reconditioned or disposed of; or **(ii)** air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products or any noise.

**Pollution** means any actual, or threat of, discharge, emission, release, dispersal, escape of or treatment, removal or disposal of any **Pollutants**. **Pollution** also includes any regulation, order, direction or request to test, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**.

**Pre-Claim Expenses** mean the reasonable fees, costs and expenses incurred by an **Insured** in investigating or responding to matters described in a **Noticed Matter**, on or after the date the **Noticed Matter** is submitted to the Insurer and prior to the date the **Noticed Matter** becomes a **Claim**. **Pre-Claim Expenses** do not include **Overhead Expenses**, **Demand Response Costs** or any fees, costs or expenses incurred by an **Insured** as a result of any **Routine Examination**.

**Prior Notice Matter** means any matter, fact, circumstance, situation, transaction, event or **Wrongful Act** that has been the subject of any notice accepted under any insurance policy, coverage section or coverage part of which the respective Coverage Part in this Policy is a direct or indirect renewal or replacement.

**Property Damage** means any actual or alleged damage to, or destruction of, any tangible property including loss of use or diminution in value of such damaged or destroyed property.

**Related Claims** mean all **Claims** that are based upon, arising from or are logically or causally connected by the same, or any related or common, or a series of related or common, facts, circumstances, transactions or **Wrongful Acts**.

**Routine Examination** means any routine or regularly scheduled examination, inspection or audit, any general requests for information, any general oversight or compliance activity or any other similar reviews, inquiries or investigations.

**Subsidiary** means any: **(i)** entity while under the **Management Control** of an **Insured Entity**; or **(ii)** charitable trust, political action committee or foundation while such entity is controlled or exclusively sponsored by one or more **Insured Entities**.

**Wage and Hour Matter** means any actual or alleged violation of the Fair Labor Standards Act (except the Equal Pay Act) or any other law or common law which regulates or governs employment wage, pay or labor practices or standards, including but not limited to:

1. the calculation, recordkeeping, timing or manner of payment of minimum wages, prevailing pay rates, overtime pay or other compensation alleged to be due and owing, including the failure to compensate for any unpaid vacation pay, off the clock or remote work, or for employer sponsored activities;

2. failure to provide or enforce legally required meal or rest break periods;

3. the classification of any entity or person for wage and hour purposes;

4. garnishments, withholdings or other deductions from wages;

5. use of federal or state tip credits or maintenance and distribution of tip pools; or

6. reimbursement of work-related expenses or tools to any person providing services or labor to or on behalf of an **Insured Entity**; or

or any similar practices, policies or procedures.

#### IV.    LIMIT OF LIABILITY, SUBLIMITS AND RETENTIONS

If Item **6.** of the General Terms and Conditions Declarations is elected, then the amount indicated in Item **6.** will be the maximum aggregate amount the Insurer will pay for all **Loss** covered under all **Liability Coverage Parts**, combined, regardless of the number of **Claims** or **Insureds**.

The amount indicated in Item **2.** of the respective **Liability Coverage Part** Declarations will be the maximum aggregate amount the Insurer will pay for all **Loss** covered under such **Liability Coverage Part** regardless of the number of **Claims** or **Insureds**.  Such Limit of Liability for each **Liability Coverage Part** shall be part of and not in addition to the Combined Aggregate Limit of Liability as set forth in Item **6.** of the General Terms and Conditions Declarations.

If a single **Claim** (as described in Section **VII.** of these General Terms and Conditions) is covered in whole or in part under more than one **Liability Coverage Part**, then the applicable Limits of Liability under each such **Liability Coverage Part** shall be applied separately to the part of such **Claim** covered under the respective Coverage Part, but the Insurer's maximum aggregate liability for all **Loss** covered under all such **Liability Coverage Parts**, combined, on account of such **Claim** shall not exceed the largest of such remaining applicable Limits of Liability.  This paragraph does not increase the Insurer's maximum liability with respect to such **Claim**.

Except to the extent otherwise expressly stated in this Policy, any Sublimit of Liability under this Policy is part of and not in addition to any otherwise applicable Limit of Liability, and further limits but does not increase the Insurer's liability under this Policy.

**Defense Costs** are part of and not in addition to the Limit of Liability set forth in Item **6.** of the General Terms and Conditions Declarations or Item **2.** of the respective **Liability Coverage Part** Declarations.  The Insurer's payment of any **Defense Costs** will erode and may exhaust the applicable Limit of Liability.

The Declarations for the respective **Other Coverage Parts** state the maximum amount the Insurer will pay for all loss covered under such **Other Coverage Part**.

Each Coverage Part Declarations states the amount of any applicable Retention under the Coverage Part. Any Retention amount shall be uninsured and the **Insureds'** responsibility to pay.  No Retention shall apply to **Loss** incurred by an **Insured Person** for which the **Insured Entities** are not permitted by common or statutory law to indemnify or are not financially able to indemnify by reason of **Financial Insolvency**.  If a single **Claim** is subject to more than one Retention, each such Retention shall be applied to the portion of **Loss** subject to each such Retention, but the sum of all Retentions applicable to such **Claim** shall not exceed the largest of such applicable Retentions.

The **Insured Entity** agrees to indemnify its **Insured Persons**, and to advance **Defense Costs** incurred by its **Insured Persons**, to the fullest extent permitted by law.

#### V.    EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGE PARTS

If this Policy terminates or is cancelled as described in Section **XI.** of these General Terms and Conditions other than for non-payment of premium, the **Insureds** shall have the right, upon payment of the respective additional premium set forth in Item **4.** of the General Terms and Conditions Declarations, to an extension of the coverage granted by the **Liability Coverage Parts** for the respective **Extended Reporting Period** set forth in such Item **4.** following the effective date of the termination or cancellation, but only with respect to any **Wrongful Act** taking place prior to the effective date of such termination or cancellation.  This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the **Insureds** to the Insurer within thirty (30) days following the effective date of termination or cancellation.

The entire additional premium for the **Extended Reporting Period** shall be deemed fully earned at the inception of the **Extended Reporting Period**.

The election and purchase of an **Extended Reporting Period** does not reinstate or increase the Insurer's maximum liability under this Policy or under any one or more **Liability Coverage Parts.**

## VI.    NOTICE AND REPORTING

### A.    Reporting a **Claim** under any **Liability Coverage Part**

As a condition precedent to their rights under a **Liability Coverage Part** with respect to a **Claim**, the **Insureds** must provide written notice to the Insurer of the **Claim** as soon as practicable after an **Executive Officer** of the **Named Insured** first becomes aware of such **Claim**, subject to the following:

1. The Insurer may assert that a notice of a **Claim** is not as soon as practicable only if the Insurer has been materially prejudiced by such late notice.

2. In any event, such written notice of **Claim** must be given to the Insurer no later than:

   a. ninety (90) days after the **Policy Period** terminates or expires, if no **Extended Reporting Period** is purchased; or

   b. the expiration date of the purchased **Extended Reporting Period**.

### B.    Reporting a Notice of Circumstances Under any **Liability Coverage Part**

If during the **Policy Period** the **Insureds** first become aware of circumstances that may give rise to a **Claim**, the **Insureds** may elect to submit to the Insurer a written notice of such circumstances, which must contain a description of the circumstances, the nature of the **Wrongful Act** and the persons involved.

For purposes of the **Liability Coverage Parts**, any subsequent **Claim** that is based upon or arises out of the circumstances described in such notice will be deemed to have been first made in the **Policy Period** in which the notice of circumstances was first given to the Insurer.

### C.    Reporting Under any **Other Coverage Part**

Each **Other Coverage Part** contains the reporting requirement for that Coverage Part.

### D.    Effective Notice

Except as otherwise provided in this Policy, all notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, email or fax properly addressed to the appropriate party.  Notice to the **Insureds** may be given to the **Named Insured** at the address as shown in Item **1.** of the General Terms and Conditions Declarations.  Notice to the Insurer shall be given to the respective address shown in Item **3.** of the General Terms and Conditions Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or in the case of courier, email or fax, one day following the date such notice is sent, whichever is earlier, subject to proof of transmittal.

## VII.    RELATED CLAIMS

With respect to the **Liability Coverage Parts**, all **Related Claims** will be treated as a single **Claim** first made on the earliest date any of such **Related Claims** was first made or deemed made in accordance with the provisions of the applicable **Liability Coverage Part**.

## VIII.    DEFENSE, COOPERATION AND CONSENT

The Insurer shall have the right and duty to defend any **Claim** against the **Insureds** which is covered by the **Liability Coverage Parts**, even if the allegations in the **Claim** are groundless, false or fraudulent.  However, the **Insureds** and not the Insurer shall have the duty to defend any **Claim** which in whole or in part is for a **Wage and Hour Matter** and is covered under the Employment Practices and Third Party Liability Coverage Part, if purchased, by reason of an Endorsement to such Coverage Part; provided the Insurer will advance under such Coverage Part on a current basis (but no later than sixty (60) days after the Insurer's receipt of the **Defense Costs** invoice) the covered **Defense Costs** incurred by the **Insureds** on account of such **Claim**. The Insurer's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

The **Insureds** shall:

A. provide to the Insurer all cooperation, assistance and any information which the Insurer may reasonably request;

    **B.** not do anything that may increase the Insurer's liabilities or prejudice the Insurer's potential or actual rights of recovery or subrogation;

    **C.** not incur any **Defense Costs**, admit any liability or assume any contractual obligation, accept or consent to any settlement, make any offer of settlement or stipulate to any judgment, without the Insurer's prior written consent; however, the Insurer's consent with respect to incurring **Loss** on account of a **Claim** will not be required if the **Insureds** can fully resolve such **Claim**, including all **Related Claims**, for an aggregate amount (including all **Defense Costs** and other **Loss**) within the applicable Retention.

The Insurer:

    **A.** shall have the right to make any reasonable investigation of any **Claim** or **Noticed Matter** that the Insurer deems necessary or appropriate;

    **B.** may make any settlement of any **Claim** that the Insurer deems reasonable, provided the **Insureds** consent to such settlement;

    **C.** shall not withhold its written consent unreasonably; and

    **D.** shall not be liable for any **Loss** for which the **Insureds** must obtain the Insurer's consent as described above unless the Insurer provides its prior written consent thereto.

## IX. APPLICATION

The Insurer has relied upon the truthfulness and accuracy of the statements, representations and information in the **Application**, which is incorporated into this Policy, in providing coverage under this Policy.

The **Application** for coverage under this Policy or any **Liability Coverage Part** shall be considered to be a separate **Application** for coverage by each **Insured Person**, and no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person** with respect to the **Application**.

If the **Application** contains any misrepresentation or omission made with the actual intent to deceive or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the Insurer under a **Liability Coverage Part**, then with respect to any **Claim** based upon, attributable to, or arising out of the facts that were not truthfully and accurately disclosed as a result of such misrepresentation or omission, no coverage shall be provide under the respective **Liability Coverage Part** for any:

    **A.** **Insured Person** who knew the facts that were not truthfully and accurately disclosed in the **Application** (whether or not such misrepresentation or omission in the **Application** was known by such **Insured Person**) or any **Insured Entity** to the extent it indemnifies any such **Insured Person**; and

    **B.** **Insured Entity**, but only if any **Executive Officer** knew the facts that were not truthfully disclosed in the **Application** (whether or not such misrepresentation or omission in the **Application** was known by such **Executive Officer**).

The Insurer shall not rescind, in whole or in part, any coverage under any **Liability Coverage Part** for any reason.

## X. CHANGES OF EXPOSURE

    **A.** <u>Change of Control</u>

    If during the **Policy Period** a **Change of Control** occurs:

        **1.** The **Liability Coverage Parts** will continue until the end of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** occurring prior to the effective date of such **Change of Control**;

        **2.** The premium for this Policy will become fully earned and non-refundable as of the effective date of such **Change of Control**; and

        **3.** If the **Insureds** notify the Insurer of such **Change of Control** at least sixty (60) days prior to the effective date thereof, the Insurer will provide to the **Named Insured** a written proposal for extended run-off coverage.

**B.** Subsidiaries

If before or during the **Policy Period** an **Insured Entity** acquires or creates a new **Subsidiary** or acquires an entity by merger or consolidation, coverage under any **Liability Coverage Part** automatically shall apply to the new **Subsidiary** or acquired entity and its **Insureds**, provided such coverage shall apply only with respect to **Claims** for **Wrongful Acts** taking place after such acquisition or creation.

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage under any **Liability Coverage Part** with respect to such **Subsidiary** and its **Insureds** shall continue until termination of this Policy, provided such coverage shall apply only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**.

**C.** Plans

With respect to the Fiduciary Liability Coverage Part (if purchased):

**1.** If before or during the **Policy Period** a **Plan** is acquired or created, coverage under the Fiduciary Liability Coverage Part automatically shall apply to such new **Plan** and its **Insureds**, provided such coverage shall apply only with respect to **Claims** for **Wrongful Acts** taking place after such acquisition or creation.

**2.** If before or during the **Policy Period** a **Plan** is terminated, coverage for such **Plan** and its **Insureds** under the Fiduciary Liability Coverage Part shall continue until termination of this Policy with respect to **Wrongful Acts** taking place before or after such termination.

**D.** Creation or Acquisition of an ESOP

With respect to the Fiduciary Liability Coverage Part (if purchased):

**1.** If during the **Policy Period** an **Insured** directly or indirectly acquires or creates an employee stock ownership plan ("ESOP"), the **Insured** shall give the Insurer written notice of such creation or acquisition, along with any other information the Insurer requests.

**2.** The Insurer shall, at the **Insured Entity's** request, provide a quotation for coverage for **Claims** based upon, attributable to or arising out of such ESOP, subject to any terms, conditions, limitation of coverage and such additional premium as the Insurer, in its sole discretion, may require. No coverage will be afforded under the Fiduciary Liability Coverage Part for any such **Claim** unless the **Insureds** agree to any such quoted terms, conditions and limitations of coverage and pay such additional premium required by the Insurer.

## XI.   CANCELLATION, TERMINATION OR NON-RENEWAL

**A.** This Policy shall be cancelled or terminates as of the earliest of the following times:

**1.** when written notice of cancellation from the **Named Insured** is received by the Insurer, provided that the **Named Insured** may not cancel this Policy after the effective date of a **Change of Control**;

**2.** twenty (20) days after receipt by the **Named Insured** of written notice from the Insurer of cancellation for non-payment of premium, provided that such cancellation shall not apply if the Insurer receives such premium within such twenty (20) day period;

**3.** such other time as may be agreed to by the **Named Insured** and the Insurer; or

**4.** expiration of the **Policy Period** as described in Item **2.** of the General Terms and Conditions Declarations.

**B.** If this Policy is canceled by the **Named Insured**, the Insurer will promptly send to the **Named Insured** the unearned premium refund, computed at customary short rates. Any other refund under any other cancellation provision shall be computed pro rata. The cancellation will be effective even if the Insurer has not made or offered a premium refund.

**C.** Either the Insurer or the **Named Insured** may refuse to renew this Policy, or any Coverage Part of this Policy. The Insurer shall provide written notice of non-renewal to the **Named Insured** at least sixty (60) days prior to the expiration of the **Policy Period**. Except as prohibited by law, an offer of terms, conditions or premium different than this Policy shall not be considered a refusal to renew.

**XII.    SUBROGATION AND RECOUPMENT**

Solely with respect to any **Liability Coverage Part**, in the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery, including without limitation any right of recovery from an **Insured Entity** for **Loss** incurred by **Insured Persons** which is indemnifiable by the **Insured Entity**. The **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insureds**. In any subrogation claim against the **Insured Entity** to enforce the **Insured Persons'** right of indemnification, the shareholder and board of directors resolutions of the **Insured Entity** shall be deemed to provide indemnification to the fullest extent permitted by law, and the Insurer's recovery from the **Insured Entity** of such **Loss** shall not exceed the Retention applicable to the **Insured Entity** for such **Loss**. The Insurer shall not exercise its right of subrogation against an **Insured Person** with respect to payments under any **Liability Coverage Part**.

Any paid **Loss** recovered by the Insurer through subrogation or recoupment, less costs incurred by the Insurer to obtain the recovery, will be applied to any Limit of Liability under this Policy which was eroded or exhausted by such paid **Loss**.

**XIII.    GENERAL POLICY PROVISIONS**

The **Named Insured** agrees to act on behalf of all **Insureds** with respect to:

**A.**  providing or receiving any notice;

**B.**  the payment of any premiums;

**C.**  receiving any applicable return premiums; and

**D.**  agreeing to and accepting any endorsements.

This Policy, including the **Application** and any endorsements hereto, constitutes the entire contract existing between the **Insureds** and the Insurer or any of their agents relating to this insurance.

The provisions of this Policy cannot be waived or changed except by written endorsement issued to form a part of this Policy. The Insurer will not be bound by any assignment of interest under this Policy unless the assignment is specifically endorsed to this Policy.

**XIV.    BANKRUPTCY**

Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

In the event a liquidation or reorganization proceeding is commenced by or against an **Insured Entity** pursuant to the United States Bankruptcy Code, as amended, or any similar foreign, state or local law, the **Insured Entity** and the **Insureds** hereby (i) waive and release any automatic stay or injunction which may apply in such proceeding to this Policy or its proceeds under such bankruptcy law, and (ii) agree not to oppose or object to any efforts by the Insurer, the **Insured Entity** or any **Insured** to obtain relief from any such stay or injunction.

**XV.    OTHER INSURANCE**

Solely with respect to any **Liability Coverage Part**, if any **Loss** is insured under any other valid and collectible policy(ies) issued to any **Insured**, then this Policy shall act as an excess insurance policy and will cover such **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this Policy. Notwithstanding the foregoing, this Policy shall apply on a primary basis with respect to any personal liability insurance policy purchased by an **Insured Person**.

**XVI.    PAYMENT PRIORITY**

If the **Loss** due and owing by the Insurer under a **Liability Coverage Part** exceeds the then-remaining Limit of Liability applicable to such **Loss**, the Insurer shall pay such **Loss**, subject to the applicable Limits of Liability, in the following priority:

**A.** First, the Insurer shall pay such **Loss** which is incurred by **Insured Persons** and which is not indemnified by an **Insured Entity**;

**B.** Second, the Insurer shall pay such **Loss** which is incurred by a **Plan** and is covered under the Fiduciary Liability Coverage Part (if purchased);

**C.** Third, the Insurer shall pay all other **Loss** covered under the **Liability Coverage Part**.

Subject to the foregoing paragraph, the Insurer shall, upon receipt of a written request from the **Named Insured**, delay any payment of **Loss** due and owing to the **Insured Entity** until such time as the **Named Insured** designates, provided the Insurer's liability with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

## XVII. STATE AMENDATORY INCONSISTENCY STATEMENT

In the event that there is an inconsistency between the terms and conditions of this Policy and any state amendatory endorsement hereto, then where permitted by law such terms and conditions that are most favorable for the **Insureds** shall apply.

## XVIII. TERRITORY AND VALUATION

Coverage under this Policy will apply worldwide, but this Policy does not provide coverage for any **Insured**, transaction, **Loss** or other matters that are uninsurable under the laws or regulations of the United States concerning trade or economic sanctions.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

## XIX. ALLOCATION

If in any **Claim** under the **Liability Coverage Parts** the **Insureds** incur both **Loss** covered by this Policy and loss not covered by this Policy either because the **Claim** against the **Insureds** includes both covered and uncovered matters or because the **Claim** is made against both **Insureds** who are afforded coverage for such **Claim** and others, including **Insureds**, who are not afforded coverage for such **Claim**, the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters; provided however that one hundred percent (100%) of any such **Defense Costs** on account of a **Claim** shall be allocated to covered **Loss** if and to the extent the Insurer has a duty to defend such **Claim**.

In any arbitration, suit or other proceeding among the Insurer and the **Insureds**, no presumption shall exist concerning what is a fair and proper allocation between covered **Loss** and uncovered loss.

# DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART - PRIVATE COMPANY

## I.  INSURING AGREEMENTS

**A.**  Individual Non-Indemnified Liability Coverage

The Insurer shall pay, on behalf of the **Insured Persons**, **Loss** which the **Insured Persons** become legally obligated to pay by reason of a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the **Extended Reporting Period** for an **Wrongful Act**, but only to the extent that such **Loss** is not indemnified by an **Insured Entity**.

**B.**  Individual Indemnified Liability Coverage

The Insurer shall pay, on behalf of an **Insured Entity**, **Loss** which the **Insured Persons** become legally obligated to pay by reason of a **Claim** first made against the **Insured Persons** during the **Policy Period**, or, if applicable, the **Extended Reporting Period** for a **Wrongful Act**, but only to the extent the **Insured Entity** has indemnified the **Insured Person** for such **Loss**.

**C.**  Entity Liability Coverage

The Insurer shall pay, on behalf of an **Insured Entity**, **Loss** which the **Insured Entity** becomes legally obligated to pay by reason of a **Claim** first made against the **Insured Entity** during the **Policy Period**, or, if applicable, the **Extended Reporting Period** for a **Wrongful Act**.

## II.  COVERAGE EXTENSIONS

**A.**  Demand Response Costs Coverage

The Insurer shall pay, on behalf of an **Insured Entity**, **Demand Response Costs** incurred by the **Insured Entity** in response to a **Securityholder Derivative Demand** or **Books and Records Demand** first made against the **Insured Entity** or its **Executives** during the **Policy Period** or, if applicable, the **Extended Reporting Period**.

The Insurer's maximum liability for all **Demand Response Costs** covered pursuant to this Section **II.A.** shall not exceed in an aggregate amount the **Demand Response Costs** Sublimit of Liability as set forth in Item **4.A.** of this Coverage Part's Declarations, which aggregate amount shall be part of and not in addition to, the Aggregate Limit of Liability set forth in Item **2.** of this Coverage Part's Declarations, and no Retention shall apply to **Demand Response Costs**.

**B.**  Crisis Event Expenses Coverage

The Insurer shall pay, on behalf of an **Insured Entity**, **Crisis Event Expenses** incurred by the **Insured Entity** in response to a **Crisis Event** occurring during the **Policy Period** or, if applicable, the **Extended Reporting Period**.

The Insurer's maximum liability for all **Crisis Event Expenses** covered pursuant to this Section **II.B.** shall not exceed in an aggregate amount the **Crisis Event Expenses** Sublimit of Liability as set forth in Item **4.B.** of this Coverage Part's Declarations, which aggregate amount shall be part of and not in addition to, the Aggregate Limit of Liability set forth in Item **2.** of this Coverage Part's Declarations, and no Retention shall apply to **Crisis Event Expenses**.

**C.** Side A Additional Limit of Liability

Notwithstanding anything to the contrary set forth in this Policy, this Coverage Part shall provide an Additional Side A Limit of Liability in the amount set forth in Item **3.** of this Coverage Part's Declarations, and such amount shall be in addition to, and not part of, any other Limit of Liability applicable under this Policy.

Such Side A Additional Limit of Liability shall be:

**1.** available only for **Loss** incurred by **Executives** and covered under Insuring Agreement **A.** of this Coverage Part; and

**2.** excess of any valid and collectible insurance that is specifically excess to this Coverage Part, and such excess insurance must be completely exhausted by payment of loss as provided therein before the Insurer shall have any obligation to make any payment on account of such Side A Additional Limit of Liability.

**D.** Outside Position Coverage

Subject to the other terms and conditions applicable to this Coverage Part, Insuring Agreement **A.** and Insuring Agreement **B.** of this Coverage Part include coverage for **Executives** while serving in an **Outside Position**. Such coverage shall be specifically excess of any indemnification and insurance available from or provided by the **Outside Entity** in which the **Executive** serves in the **Outside Position**.

**E.** Executive Extended Reporting Period Option

In the event that an **Insured Entity** does not purchase an **Extended Reporting Period** within the required time period, then any **Executive** will have the right to elect only for such **Executive** an **Extended Reporting Period** for no additional premium. The **Executive** must notify the Insurer of this election in writing within thirty (30) days after expiration of the time period in which the **Insured Entity** may purchase an **Extended Reporting Period**. Any **Extended Reporting Period** elected by any **Executive** will apply only to **Claims** made against such **Executive** under Insuring Agreement **A.** of this Coverage Part. All other terms and conditions of this Policy applicable to an **Extended Reporting Period** will apply to this **Extended Reporting Period** for such **Executive**, and no separate or additional limit of liability under this Policy shall apply to such **Extended Reporting Period**.

**III. DEFINITIONS**

Any defined term not defined in this Coverage Part will have the meaning assigned to it in the General Terms and Conditions.

**Antitrust Violation** means any actual or alleged violation of any federal, state, local or foreign law or common law which prohibits antitrust, price fixing or price discrimination, restraint of trade or competition, monopolization or predatory pricing, including without limitation any actual or alleged violation of the Sherman Anti-Trust Act or the Clayton Act, as amended.

**Books and Records Demand** means a written request by, or on behalf of, an **Insured Entity's** securityholder to inspect the **Insured Entity's** books, records and stock ledgers pursuant to a statutory right of inspection.

**Claim** means any of the following, including if applicable any appeal therefrom:

**1.** a written demand against an **Insured** for monetary damages or non-monetary or injunctive relief, commenced by the **Insured's** receipt of such demand;

**2.** a civil proceeding against an **Insured**, commenced by the service of a complaint or similar pleading upon the **Insured**;

**3.** a criminal proceeding against an **Insured**, commenced by:

**a.** an arrest of the **Insured**, or

**b.** the return of an indictment or the filing of a criminal complaint, information or similar document against the **Insured**;

4.  a formal administrative or formal regulatory adjudicatory proceeding against an **Insured**, commenced by the filing of a notice of charges, formal investigative order or similar document which names the **Insured** as a target or subject of such proceeding;

5.  an arbitration, mediation or other alternative dispute resolution proceeding against an **Insured**, commenced by the **Insured's** receipt of a demand for arbitration or mediation or similar document;

6.  a civil, criminal, administrative or regulatory investigation against an **Insured**, commended by the service upon or other receipt by the **Insured** of a written notice, target letter or other written notice from the investigating authority identifying by name the **Insured** as an individual or entity against whom a formal proceeding may be commenced, but any such investigation of an **Insured Entity** shall constitute a **Claim** only while such investigation is also against an **Insured Person**;

7.  an official request for the **Extradition** of an **Insured Person**;

8.  a written request that an **Insured** toll or waive a statute of limitations relating to a potential **Claim** as described in Subparagraphs **1.** through **7.** of this definition, commenced by the **Insured's** receipt of such request;

9.  solely for purposes of Insuring Agreements **A.** and **B.** of this Coverage Part, and solely with respect to **Defense Costs**, a written request or subpoena from a governmental or enforcement authority:

    a.  to interview or depose an **Insured Person** in his or her capacity as such; or

    b.  to produce documents by an **Insured Person** in his or her capacity as such;

    whether or not the **Insured Person** who received such request or subpoena allegedly committed a **Wrongful Act**; provided that such request or subpoena **(i)** is not part of a **Routine Examination** of an **Insured Entity**, and **(ii)** shall constitute a **Claim** only if and when the **Insureds** elect to give to the Insurer written notice thereof.

**Computer System** means any computer hardware, software and peripheral devices, including offline media libraries or backups, linked through a network that are under the direct operational control of the **Insured Entity**, owned or leased by the **Insured Entity**, and used by the **Insured** to store, collect, transmit, process, maintain or retrieve the **Insured Entity's Data**.

**Contractual Liability** means the **Insured's** actual or alleged liability voluntarily undertaken by the **Insured** pursuant to any contract or agreement. **Contractual Liability** does not include liability that would be imposed upon the **Insured** in the absence of such contract or agreement.

**Crisis Event** means the:

1.  death, incapacity or criminal indictment of the Chief Executive Officer, Chief Financial Officer or any functionally equivalent position of the **Named Insured**;

2.  public announcement that an **Insured Entity** intends to file for bankruptcy protection; or

3.  public announcement of an impending governmental, regulatory or criminal proceeding against an **Insured Entity**.

**Crisis Event Expenses** means the reasonable fees, costs and expenses that are incurred by an **Insured Entity** to minimize potential economic or reputational harm to the **Insured Entity** as a result of a **Crisis Event**. Such **Crisis Event Expenses** include fees, costs and expenses to:

1.  retain an outside law firm, public relations firm or crisis management firm to advise the **Insured Entity** with respect to the **Crisis Event**; and

2.  manage press coverage, publicity, press relationships and other external communications with respect to the **Crisis Event**.

**Crisis Event Expenses** do not include **Overhead Expenses**, expenses incurred prior to any notice of the **Crisis Event** is submitted to the Insurer, or expenses incurred more than one hundred eighty (180) days after the date the **Crisis Event** was noticed to the Insurer.

**Data** means information contained, processed or stored in a **Computer System,** that does not provide instructions or directions to a **Computer System** and that is subject to regular back-up procedures.

**Demand Response Costs** mean the reasonable fees, costs and expenses incurred by an **Insured Entity** in responding to: **(i)** a **Books and Records Demand**; or **(ii)** in connection with the investigation of a **Securityholder Derivative Demand**. **Demand Response Costs** do not include **Overhead Expenses**.

**Discrimination/Harassment** means any actual or alleged discrimination against, or harassment of, a third party by an **Insured**.

**Employment Related Matter** means any matter relating to the responsibilities, obligations or duties of an employer to any employee, or prospective employee, under any federal, state, local or foreign law or common law, including **Wage and Hour Matters**.

**Inadequate Consideration** means an allegation that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of an **Insured Entity** or another entity or of all or substantially all of the ownership interest in or assets, shares or securities of an **Insured Entity** or another entity is inadequate.

**Insured** means any **Insured Person** or any **Insured Entity**.

**Insured Person** means any **Employee** or **Executive**.

**Intellectual Property Violation** means any actual or alleged misappropriation, violation or infringement of ideas, confidential information, trade secrets, copyright, trademark, trade name, patent or other intellectual property right.

**Loss** means the amount the **Insureds** become legally obligated to pay by reason of a **Claim** for which coverage under this Coverage Part applies, including but not limited to **Defense Costs**, compensatory, punitive, exemplary or multiple damages, judgments, an award of pre-judgment and post-judgment interest with respect to covered damages, settlements, claimants' attorneys' fees and costs for which an **Insured** against whom the **Claim** is made is legally obligated to pay, civil fines or civil penalties assessed against an **Insured Person** for an unintentional or non-willful violation of law (including without limitation pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 16 U.S.C. §78dd-2(g)(2)(B)), **Crisis Event Expenses**, **Demand Response Costs** and any tax imposed on an **Insured Entity** for which an **Insured Person** is liable by reason of the **Insured Entity's Financial Insolvency**.

**Loss** (other than **Defense Costs**) does not include any:

1. costs incurred by **Insureds** to comply with any injunctive or other non-monetary relief or any agreement to provide such relief;

2. amounts which are uninsurable under the law pursuant to which this Policy is construed;

3. taxes imposed by law, other than taxes described above;

4. **Clean-Up Costs**;

5. fines or penalties imposed by law, other than civil fines or penalties described above;

6. **Inadequate Consideration**; or

7. any amount for which the **Insured** is absolved from payment by reason of any covenant, agreement, court order or otherwise.

The insurability of any punitive, exemplary or multiple damages, fines, penalties or taxes otherwise covered under this Coverage Part shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured**, including without limitation the jurisdiction in which the **Insured Entity**, the **Insured Person**, the Insurer, this Policy or such **Claim** is located or has a substantial relationship.

**Outside Entity** means any entity exempt from federal income tax pursuant to Sections 501(c) of the United States Internal Revenue Code, as amended; provided such entity is not an **Insured Entity**.

**Outside Position** means the position of director, officer, manager, trustee, governor or other equivalent executive position in an **Outside Entity** held by an **Executive**, if service in such position is with the knowledge and consent of, at the direction or request of or part of the duties regularly assigned to the **Executive** by the **Insured Entity**.

**Personal Information** means any nonpublic, private, confidential or sensitive information relating to an identified or identifiable natural person under any state, federal or international statute, regulation or law that requires notice to persons or governmental or regulatory authorities where **Personal Information** was potentially or actually accessed or acquired.

**Personal Information And Data-Related Violation** means**:**

1. Any unlawful collection, retention, storage, disposal, access to or disclosure of any **Personal Information** or other person's or entity's private or confidential information, including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

2. The loss of, loss of use of, damage to, corruption of, inability to access or inability to manipulate **Data**.

**Personal Injury** means any actual or alleged:

1. wrongful entry or eviction or other invasion of the right of private occupancy;

2. libel, slander or defamation of any person;

3. violation of any person's right of privacy;

4. false arrest or false imprisonment;

5. malicious prosecution, malicious use or abuse of process; or

6. violation of any law which regulates or governs commercial solicitation, messaging, automatic contract renewals or anti-spam (including commercial emails and spam, telemarketing, texts and electronic commerce).

**Product Defect** means, with respect to any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed or developed by or on behalf of any **Insured Entity**, any actual or alleged:

1. failure, malfunction or performance failure of such goods or products; or

2. false labeling, false advertising or misrepresentation in advertising of such goods or products.

**Professional Services** mean the **Insured's** performance of, or failure to perform, services for others for a fee or other remuneration.

**Publicly Traded Securities** mean any registered debt or equity securities of an **Insured Entity** or an **Outside Entity** that are offered for purchase or sale to the public or are publicly traded.  **Publicly Traded Securities** does not include any **(i)** unregistered securities; **(ii)** securities related to a failed undertaking of, or failure to complete, an initial public offering; or **(iii)** securities during the preparation for a public offering of such securities, including any road show presentation to potential investors.

**Securityholder Claim** means any **Claim** by any owner(s) of an **Insured Entity's** equity or debt securities brought in such capacity.  **Securityholder Claim** includes a **Securityholder Derivative Suit**.

**Securityholder Derivative Demand** means any written demand by one or more securityholders of an **Insured Entity** upon the board of directors (or a functionally equivalent management body) of such **Insured Entity** to commence a lawsuit on behalf of the **Insured Entity** against **Insured Persons** for **Wrongful Acts**.

**Securityholder Derivative Suit** means a lawsuit brought derivatively on behalf of an **Insured Entity** by one or more securityholders of such **Insured Entity** against **(i)** one or more **Executives** of such **Insured Entity**; or **(ii)** the **Insured Entity** as a nominal defendant.

**Unfair Trade Practices** mean any actual or alleged violation of any federal, state, local or foreign law or common law which prohibits unfair or deceptive trade or business practices.

**Whistleblower Activity** means an **Insured Person's** lawfully permitted disclosure to, or assistance in an investigation by, a governmental or law enforcement agency relating to alleged wrongdoing by an **Insured**, provided such activities are legally protected against retaliation.

**Wrongful Act** means any:

1. error, misstatement, misleading statement, neglect, breach of duty, omission or act committed, attempted or allegedly committed or attempted by:

    a. an **Insured Person** in his or her capacity as such; or

    b. an **Insured Entity**; or

2. matter claimed against an **Insured Person** solely by reason of his/her status as such.

## IV. EXCLUSIONS

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

A. based upon or arising from any:

    1. **Conduct**;

    2. **Prior Notice Matter**;

    3. **Pending or Prior Litigation**;

    4. **Discrimination/Harassment**;

    5. **Publicly Traded Securities**;

    6. **Employment Related Matter**; provided this exclusion **6.** does not apply to any **Claim** (other than a **Claim** for **Wage and Hour Matters**) against an **Insured Person**; or

    7. **Pollution**; provided this exclusion **7.** does not apply to any:

        a. **Claim** under Insuring Agreement **A.** of this Coverage Part; or

        b. **Securityholder Claim**;

    8. **Personal Information And Data-Related Violation** provided this exclusion **8.** does not apply to any:

        a. **Claim** under Insuring Agreement **A.** of this Coverage Part; or

        b. **Securityholder Claim**.

B. against an **Insured Entity** based upon or arising from any:

    1. **Antitrust Violation**;

    2. **Contractual Liability**;

    3. **Unfair Trade Practices**;

    4. **Intellectual Property Violation**;

    5. **Personal Injury**;

    6. **Product Defect**; or

    7. **Professional Services**;

provided the exclusions in this Section **IV.B.** do not apply to any **Securityholder Claim**.

    **C.** for any:

      **1.** **Property Damage**;

      **2.** **ERISA Violation**;

      **3.** **Bodily Injury**; provided this exclusion **3.** does not apply to:

        **a.** Insuring Agreement **A.** of this Coverage Part;

        **b.** any **Securityholder Claim**;

        **c.** any actual or alleged emotional distress, mental anguish or humiliation made in connection with any **Employment Related Claim** against an **Insured Person**; or

        **d.** **Defense Costs** incurred by an **Executive** in the defense of a **Claim** for any actual or alleged violation of a corporate manslaughter statute by such **Executive**.

    **D.** brought or maintained by or on behalf of any **Insured** in any capacity against any other **Insured**, or by or on behalf of an **Outside Entity** against any **Insured**, unless such **Claim** is:

      **1.** a **Securityholder Derivative Suit** or a derivative suit brought on behalf of an **Outside Entity** against an **Insured Person** in his/her **Outside Position** for such **Outside Entity**;

      **2.** brought while the **Insured Entity** or **Outside Entity** is in **Financial Insolvency**;

      **3.** brought by an **Executive** who has not been in his/her insured capacity for at least one (1) year immediately prior to such **Claim** being made;

      **4.** for contribution or indemnity arising from a **Claim** otherwise covered under this Policy;

      **5.** brought against an **Insured Person** based upon or arising from **Whistleblower Activity** by such **Insured Person**;

      **6.** an **Employment Related Claim** against an **Insured Person**; or

      **7.** brought or maintained in a common law jurisdiction other than the United States or Canada, their territories or possessions.

## V. OTHER INSURANCE

Without limiting Section **XV.** of this Policy's General Terms and Conditions, this Coverage Part will be specifically excess of any valid and collectible insurance policy **(i)** for environmental liability, cyber liability, professional services liability or employment practices liability; or **(ii)** written on a duty to defend basis unless such other insurance is written specifically as excess of the limit of liability of this Coverage Part.

## VI. SEVERABILITY

For the purpose of determining the applicability of any exclusion set forth in this Coverage Part, the **Wrongful Act** or knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**, and only the **Wrongful Act** or knowledge of an **Executive Officer** of an **Insured Entity** shall be imputed to such **Insured Entity** and its **Subsidiaries**.

## VII. SECURITIES OFFERING

If an **Insured Entity** intends to sell or offer to sell securities during the **Policy Period** that are required to be registered under the Securities Act of 1933 or that are exempt from such registration by reason of the JumpStart Our Business Act ("JOBS Act"), the **Insured Entity** shall provide the Insurer written notice of the proposed sale or offering no later than thirty (30) days prior to the effective date of such sale or offering, along with all information requested by the Insurer relating to such sale or offering.  The Insurer shall provide a quotation to the **Insured Entity** for the deletion of the **Publicly Traded Securities** exclusion in Section **IV.A.** of this Coverage Part with respect to such sale or offering; provided that such quotation shall be subject to such other terms, conditions and limitations of coverage and such additional premium as the Insurer, in its sole discretion, may require.  No coverage will be afforded under this Coverage Part for any **Claim** otherwise subject to such **Publicly Traded Securities** exclusion unless the **Insured Entity** agrees to such quoted terms, conditions and limitations of coverage and pays such additional premium required by the Insurer.

# EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART - PRIVATE COMPANY

## I. INSURING AGREEMENTS

**A.** Employment Practices Liability Coverage

**1.** The Insurer shall pay, on behalf of the **Insureds**, **Loss** which the **Insureds** become legally obligated to pay by reason of an **Employment Claim** first made against the **Insureds** during the **Policy Period** or, if applicable, the **Extended Reporting Period** for any **Employment Practices Wrongful Act**.

**2.** The Insurer shall pay, on behalf of the **Insureds**, **Defense Costs** which the **Insureds** become legally obligated to pay by reason of an **Employment Claim** first made against the **Insureds** during the **Policy Period** or, if applicable, the **Extended Reporting Period** for any **Employment Contract Breach**.

**B.** Third Party Liability Coverage

The Insurer shall pay, on behalf of the **Insureds**, **Loss** which the **Insureds** become legally obligated to pay by reason of a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or, if applicable, the **Extended Reporting Period** for any **Third Party Wrongful Act**.

## II. DEFINITIONS

Any defined term not defined in this Coverage Part will have the meaning assigned to it in the General Terms and Conditions.

**Benefits** mean perquisites, fringe benefits, deferred compensation, payments for time off or leave of absence, including but not limited to any payment (including insurance premiums) in connection with an employee benefit plan. **Benefits** includes any other payment to or for the benefit of an **Employee** or **Executive** arising out of the employment relationship but shall not include salary, wages, commissions, bonuses, non-deferred cash incentive compensation or **Stock Benefits**.

**Claim** means any of the following, including if applicable any appeal therefrom:

**1.** solely with respect to Insuring Agreement **A.**, any **Employment Claim**; and

**2.** solely with respect to Insuring Agreement **B.**, any **Third Party Claim**.

**Class Action** means any **Claim**:

**1.** maintained by or on behalf of a putative or certified class of claimants pursuant to Rule 23, Federal Rules of Civil Procedure, or a similar state or foreign rule of civil procedure;

**2.** maintained by or on behalf of twenty (20) or more named claimants; or

**3.** maintained by a governmental entity, department, agency or authority on behalf of one or more classes or groups of similarly situated claimants.

**COBRA** means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

**Diversity Sensitivity Training Costs** mean the reasonable costs incurred by an **Insured Entity** for any training, reeducation, sensitivity or other development programs which the **Insured Entity** is obligated to establish and conduct pursuant to a judgment, settlement or alternative dispute resolution process in a covered **Claim**.

**Employment Claim** means any of the following which are brought and maintained against an **Insured** by or on behalf of any past, present, prospective or alleged **Employee** or **Executive** or applicant for employment by an **Entity**, including if applicable any appeal therefrom:

1. a written demand against an **Insured** for monetary damages or non-monetary or injunctive relief, commenced by the **Insured's** receipt of such demand, including a written demand for reinstatement, reemployment or reengagement;

2. a civil proceeding against an **Insured**, commenced by the service of a complaint or similar pleading upon the **Insured**;

3. a criminal proceeding against an **Insured**, commenced by the return of an indictment or the filing of a criminal complaint, information or similar document against the **Insured**;

4. an administrative or regulatory proceeding or investigative proceeding against an **Insured**, commenced by the filing of a notice of charges, formal investigative order or similar document which names the **Insured** as a target or subject of such proceeding, including but not limited to any such administrative or regulatory proceeding before or brought by or on behalf of the Equal Employment Opportunity Commission or any similar governmental agency located anywhere in the world with jurisdiction over the employment practices of the **Insured Entity**; provided that with respect to an audit by the Office of Federal Contract Compliance Programs, such a proceeding shall be commenced by the **Insured** receiving a Notice of Violation or Order to Show Cause;

5. an arbitration, mediation or other alternative dispute resolution proceeding against an **Insured**, commenced by the **Insured's** receipt of a demand for arbitration or mediation or similar document; or

6. a written demand that an **Insured** toll or waive a statute of limitations relating to a potential **Employment Claim** otherwise described in this definition, commenced by the **Insured's** receipt of such demand.

Notwithstanding anything to the contrary in this definition, **Employment Claim** shall not include any labor or grievance arbitration or other proceeding pursuant to or governed by a collective bargaining agreement.

**Employment Contract Breach** means any actual or alleged breach of any employment-related oral, written or implied contract with an **Insured Entity**, including any such contract arising out of any personnel manual, employee handbook, policy statement or other representation.

**Employment Discrimination** means any actual or alleged violation of employment discrimination laws or public policy, including but not limited to any actual, alleged or constructive employment termination, dismissal or discharge, employment demotion, denial of tenure, modification of any term or condition of employment, any failure or refusal to hire or promote or any limitation or segregation of any **Employee**, **Executive** or applicant for employment, that would in any way deprive any person of employment opportunities or otherwise affect his or her status as an employee based on such person's race, color, religion, creed, age, sex, disability, marital status, genetic information, national origin, pregnancy, HIV status, sexual orientation or preference, veteran status or any other status that is protected pursuant to any federal, state, local or foreign statutory law or common law.

**Employment Practices Wrongful Act** means any of the following actually or allegedly committed by the **Insured Entity** or by **Insured Persons** in their capacity as such:

1. **Employment Discrimination**;

2. **Harassment**;

3. **Retaliation**;

4. **Workplace Tort**;

5. **Wrongful Employment Decision**; or

6. **Wrongful Termination**.

**Harassment** means any actual or alleged:

1. harassment, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature that is made as a condition of employment with, used as a basis for employment decisions by or interferes with performance or creates an intimidating, hostile or offensive working environment within, the **Insured Entity**; or

2. workplace harassment, including work-related harassment or bullying of a non-sexual nature that interferes with performance or creates an intimidating, hostile or offensive working environment within the **Insured Entity**.

**Insured Persons** means any:

1. **Executive** and any natural persons who were, now are or shall become a director of human resources or the functional equivalent thereof of the **Insured Entity**;

2. **Employee** who is not described in subparagraph 1. above; and

3. **Independent Contractor**, but only if the **Insured Entity** has agreed, prior to the date of the alleged **Wrongful Act** by such **Independent Contractor**, to provide indemnification to such individual to the same extent as that provided to the **Insured Entity's** employees.

**Insureds** means the **Insured Entity** and the **Insured Persons**.

**Loss** means the amount the **Insureds** become legally obligated to pay by reason of a **Claim** made against them for which coverage under this Coverage Part applies, including but not limited to compensatory, punitive, exemplary or multiple damages, judgments, an award of pre-judgment and post-judgment interest with respect to covered damages, settlements, **Defense Costs**, claimant's attorney's fees and costs for which an **Insured** against whom the **Claim** is made is legally obligated to pay by reason of a court order or settlement agreement to which the Insurer consents pursuant to Section VIII. of the General Terms and Conditions, civil fines or civil penalties assessed against an **Insured Person** for an unintentional or non-willful violation of any federal, state, local or foreign law, back pay or front pay, liquidated damages awarded in accordance with the Age Discrimination in Employment Act, Family and Medical Leave Act, or Equal Pay Act, and **Diversity Sensitivity Training Costs**.

**Loss** (other than **Defense Costs**) does not include **(1)** any amount for which the **Insureds** are absolved from payment by reason of any covenant, agreement, court order or otherwise, **(2)** taxes imposed by law, **(3)** fines or penalties imposed by law, other than civil fines or penalties expressly referenced above, **(4)** any costs to modify any building or property, **(5)** salary, wages, commissions, bonuses, non-deferred cash incentive compensation, severance compensation of any kind, **Stock Benefits** or other compensation actually or allegedly earned by the claimant in the course of employment, other than back pay, front pay or any additional compensation allegedly due as a result of an **Employment Practices Wrongful Act**, **(6)** future salary, wages, commissions or **Benefits** of a claimant who has been hired, promoted or reinstated to employment, or shall be hired, promoted or reinstated to employment pursuant to a settlement, order or other resolution of any **Claim**; **(7) Benefits** due or that are to become due, or the equivalent value of such **Benefits**, except with respect to any **Employment Claim** for **Wrongful Termination**, or **(8)** matters uninsurable under the law pursuant to which this Policy is construed.

The insurability of punitive, exemplary or multiple damages, fines or penalties otherwise covered under this Coverage Part shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insureds**, including without limitation the jurisdiction in which the **Named Insured**, the **Insured Persons**, the Insurer, this Policy or such **Claim** is located or has a substantial relationship.

**NLRA** means the National Labor Relations Act, as amended, or similar law governing employees' rights and employers' duties with respect to unions, bargaining, strikes, boycotts, picketing, lockouts or collective activities.

**OSHA** means the Occupational Safety and Health Act of 1970, as amended, or similar law governing workplace safety and health.

**Retaliation** means any actual or alleged retaliatory treatment against an **Employee** based upon such individual:

1. refusing to violate any law, opposing any unlawful practice or exercising his or her rights under law;

2. threatening to disclose or disclosing to an **Insured Person** or to any governmental agency any alleged violations of law by an **Insured**;

3. assisting, testifying or cooperating with a proceeding or investigation (including the **Insured Entity's** internal investigation) regarding the **Insured's** alleged violations of law; or

4. filing any claim against the **Insured Entity** pursuant to any federal, state, local or foreign whistleblower law.

**Stock Benefits** means:

1. any offering, plan or agreement between an **Insured Entity** and any **Employee** which grants stock, stock options, warrants or shares of the **Insured Entity** to such **Employee**, including grants of stock options, restricted stock, stock warrants, performance stock shares, membership shares, or any other incentive or compensation granted in the form of securities of the **Insured Entity**; or

2. any instrument or payment whereby the value or amount of such instrument or payment is derived from the value of the **Insured Entity's** securities, including a phantom stock plan or arrangement or stock appreciation rights;

provided that **Stock Benefits** shall not include any amounts based upon, arising out of or attributable to employee stock purchase plans or employee stock ownership plans.

**Third Party** means any natural person who is at the time of a **Third Party Wrongful Act (i)** a customer, vendor, service provider or other business invitee of the **Insured Entity**, or **(ii)** an independent contractor of the **Insured Entity**.  **Third Party** shall not include any **Insured Person** or any applicant for employment with the **Insured Entity**.

**Third Party Claim** means any of the following which are brought and maintained against an **Insured** by or on behalf of a **Third Party**, including if applicable any appeal therefrom:

1. a written demand against an **Insured** for monetary damages or non-monetary or injunctive relief, commenced by the **Insured's** receipt of such demand;

2. a civil proceeding against an **Insured**, commenced by the service of a complaint or similar pleading upon the **Insured**;

3. an arbitration, mediation or other alternative dispute resolution proceeding against an **Insured**, commenced by the **Insured's** receipt of a demand for an arbitration or mediation or similar document;

4. an administrative or regulatory proceeding or investigative proceeding against an **Insured**, commenced by the filing of a notice of charges, formal investigative order or similar document which names the **Insured** as a target or subject of such proceeding; or

5. a written demand that an **Insured** toll or waive a statute of limitations relating to a potential **Third Party Claim** otherwise described in this definition, commenced by the **Insured's** receipt of such demand.

**Third Party Wrongful Act** means any **Harassment** directed against a **Third Party** committed, attempted or allegedly committed or attempted by the **Insured Entity** or by any **Insured Person** while acting in his or her capacity as such.

**WARN** means the Workers' Adjustment and Retaining Notification Act, as amended, or similar law governing employer notice requirements in advance of lay-offs or facility closings.

**Workplace Tort** means any actual or alleged employment-related:

1. misrepresentation or defamation (including libel and slander);

2. invasion of privacy, including the unauthorized use or disclosure of an **Employee's**:

    a. medical information in violation of the Health Insurance Portability and Accountability Act ("HIPPA");

    b. credit information or related information in violation of the Fair Credit Reporting Act;

    c. other information obtained through an employment-related background check;

3. wrongful evaluation, wrongful discipline or wrongful deprivation of a career opportunity.

**Workplace Tort** also means any actual or alleged employment-related:

    (i) wrongful retention, wrongful supervision, wrongful hiring or wrongful training;

    (ii) false arrest, false detention or false imprisonment;

    (iii) wrongful infliction of emotional distress, mental anguish or humiliation; or

    (iv) failure to provide or enforce consistent employment-related corporate policies and procedures;

    solely when alleged as part of an **Employment Claim** for any **Employment Contract Breach**, **Employment Discrimination**, **Harassment**, **Retaliation**, **Wrongful Employment Decision** or **Wrongful Termination**, or for any act set forth in subparagraphs **1.**, **2.** and **3.** of this definition.

**Wrongful Act** means any actual or alleged:

1. solely with respect to Insuring Agreement **A.**, an **Employment Practices Wrongful Act**; and

2. solely with respect to Insuring Agreement **B.**, a **Third Party Wrongful Act**.

**Wrongful Employment Decision** means any actual or alleged wrongful demotion, denial of tenure or failure or refusal to hire or promote, failure to employ or wrongful employee reference.

**Wrongful Termination** means any actual or alleged wrongful dismissal, termination or discharge of employment, including constructive dismissal, termination or discharge. **Wrongful Termination** does not include **Employment Contract Breach**.

## III. EXCLUSIONS

A. The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

1. based upon or arising from any:

    a. **Prior Notice Matter**;

    b. **Pending or Prior Litigation**;

    c. **Wage and Hour Matter**; provided this exclusion **c.** will not apply to any **Claim** on account of **Retaliation**; or

    d. **Pollution**; provided this exclusion **d.** will not apply to any **Claim** on account of **Retaliation**.

2. for any:

    a. **Property Damage**;

    b. **Bodily Injury**; provided this exclusion **b.** will not apply to any actual or alleged emotional distress, mental anguish or humiliation;

    c. actual or alleged violation of **ERISA** (except Section 510 thereof), **OSHA**, **WARN**, **COBRA**, **NLRA**, or any law governing workers' compensation, unemployment insurance, unemployment compensation, social security, retirement or disability benefits; provided this exclusion **c.** will not apply to any **Claim** on account of **Retaliation**; or

    **d.**  actual or alleged breach of or liability under any oral, written or implied contract or agreement, including any severance agreement or golden parachute agreement or any compensation agreement requiring payment upon the termination of any **Employee**; provided this exclusion **d.** will not apply to:

        **i.**  **Defense Costs** covered under **Insuring Agreement A.2.**; or

        **ii.**  liability that would be imposed in the absence of such employment contract or agreement.

## IV.  SEVERABILITY

For purposes of determining the applicability of any exclusion set forth in this Coverage Section, the **Wrongful Act** or knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**, and only the **Wrongful Act** or knowledge of an **Executive Officer**, Director of Human Resources or equivalent executive of an **Insured Entity** shall be imputed to such **Insured Entity** and its **Subsidiaries**.

## V.  COORDINATION OF COVERAGE

Any **Loss** otherwise covered by both this Coverage Part and any other employment practices liability policy or coverage part issued by the Insurer or its affiliate ("Other EPL Coverage") will be covered first under such Other EPL Coverage subject to such Other EPL Coverage's limit of liability, retention and coinsurance percentage.  Any remaining **Loss** otherwise covered by this Policy that is not paid under such Other EPL Coverage will then be covered under this Coverage Part subject to the Limit of Liability and Retention applicable under this Coverage Part, provided that the Retention applicable to such **Loss** under this Coverage Part will be reduced by the amount of **Loss** otherwise covered by this Coverage Part that is paid by an **Insured** as the retention under such Other EPL Coverage.

MANAGEMENT LIABILITY
PML 12 90 04 21

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# THIRD PARTY WRONGFUL ACT DEFINITION AMENDED (THIRD PARTY HARASSMENT AND THIRD PARTY DISCRIMINATION) ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART

It is understood and agreed:

**A.** The following are added to **Section II. Definitions**:

**Third Party Discrimination** means any violation of a person's civil rights based on such person's race, color, religion, creed, age, sex, disability, marital status, genetic information, national origin, pregnancy, HIV status, sexual orientation or preference, veteran status or any other status that is protected pursuant to any federal, state, local or foreign statutory law or common law.

**Third Party Harassment** means harassment**,** which includes:

**1.** sexual harassment, including unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature; or

**2.** any other harassment, including, but not limited to, bullying or intimidation.

**B.** The definition of **Third Party Wrongful Act** in **Section II. Definitions** is replaced by the following:

**Third Party Wrongful Act** means any:

**1.** **Third Party Harassment**; or

**2.** **Third Party Discrimination;**

directed against a **Third Party** committed, attempted or allegedly committed or attempted by the **Insured Entity** or by any **Insured Person** while acting in his or her capacity as such.

**POLICY NUMBER:** PML0002157 01                    **MANAGEMENT LIABILITY**
**PML 10 28 04 20**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CRISIS EVENT EXPENSES COVERAGE ENDORSEMENT (EPL)

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART

### SCHEDULE

| Crisis Event Expenses Sublimit of Liability: | $75,000 |
|---|---|

It is understood and agreed:

**1.** Section **I.** Insuring Agreements, is amended to add the following Insuring Agreement:

C.  Crisis Event Expenses Coverage

The Insurer shall pay, on behalf of an **Insured Entity**, Crisis Event Expenses incurred by the **Insured Entity** in response to a Crisis Event occurring during the **Policy Period** or, if applicable, the **Extended Reporting Period**.

The Insurer's maximum liability for all Crisis Event Expenses covered pursuant to this endorsement shall not exceed in an aggregate amount the Crisis Event Expenses Sublimit of Liability as set forth in the Schedule of this endorsement, which aggregate amount shall be part of and not in addition to, any other applicable Limit of Liability under this Policy, and no Retention shall apply to Crisis Event Expenses.

**2.** The Insurer shall not be liable under this endorsement for Crisis Event Expenses relating to:

**a.** revising or rewriting of personnel policies or procedures;

**b.** sensitivity or awareness training; or

**c.** accommodations made by the **Insured Entity** pursuant to the Americans with Disabilities Act.

**3.** For purposes of this endorsement:

**a.** "Crisis Event Expenses" means the reasonable fees, costs and expenses that are incurred by an **Insured Entity** to minimize potential economic or reputational harm to the **Insured Entity** as a result of a Crisis Event.  Such Crisis Event Expenses include fees, costs and expenses to:

**(1)** retain an outside law firm, public relations firm or crisis management firm to advise the **Insured Entity** with respect to the Crisis Event; and

**(2)** manage press coverage, publicity, press relationships and other external communications with respect to the **Crisis Event**.

Crisis Event Expenses do not include **Overhead Expenses**, expenses incurred prior to any notice of the Crisis Event is submitted to the Insurer, or expenses incurred more than one hundred eighty (180) days after the date the Crisis Event was noticed to the Insurer.

**b.** "Crisis Event" means an allegation of: **(i)** an **Employment Practices Wrongful Act** which the **Named Insured's** director of Human Resources, in-house general counsel, or equivalent executive, believes could reasonably result in a "Mass or Class Action" (as defined below); or **(ii) Harassment** by an **Executive**, which the **Named Insured's** director of Human Resources, in-house general counsel, or equivalent executive, believes could reasonably result in an **Employment Claim**.

**c.** "Mass or Class Action" means an **Employment Claim** brought or maintained:

**(1)** by or on behalf of five (5) or more natural persons who are acting in concert, whether or not such natural persons are represented by one or more legal counsel;

**(2)** by or on behalf of one (1) to four (4) natural persons if any of such natural persons are making a pattern and practice or systemic discrimination allegation and are seeking monetary relief on behalf of a class or group of complainants, whether or not such natural persons are represented by one or more legal counsel; or

**(3)** by a governmental entity, department, agency or authority making a pattern and practice or systemic discrimination allegation or seeking monetary relief on behalf of a class or group of complainants.

**POLICY NUMBER:** PML0002157 01

**MANAGEMENT LIABILITY**
**PML 10 77 04 20**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# WORKPLACE VIOLENCE EXPENSES ENDORSEMENT (SUBLIMIT)

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART

**SCHEDULE**

| Workplace Violence Expenses Sublimit: | $ 100,000 |
|---|---|

It is understood and agreed:

1. Section **I.** Insuring Agreements, is amended to add the following Insuring Agreement:

   Workplace Violence Expenses Coverage

   The Insurer shall pay, on behalf of the **Insured Entity**, Workplace Violence Expenses (as defined below) incurred by the **Insured Entity** as a result of any Workplace Violence (as defined below) occurring during the **Policy Period**; provided that the Insurer's maximum aggregate liability for all Workplace Violence Expenses covered under this endorsement shall not exceed the Workplace Violence Expenses Sublimit shown in the Schedule of this endorsement, which amount is part of, and not in addition to, any other applicable Limit of Liability under this Policy.

2. No Retention shall apply to Workplace Violence Expenses.

3. Section **III.A.** Exclusions **2.a.** and **b.** of this Coverage Part shall not apply to coverage afforded under this endorsement.

4. For purposes of this endorsement:

   **a.** "Workplace Violence" means any intentional and unlawful act:

   **(1)** of deadly force involving the use of a lethal weapon; or

   **(2)** the threat of deadly force involving the display of a lethal weapon,

   which occurs on or in the Premises (as defined below) and which did or could result in bodily injury or death to an **Insured Person**.

   **b.** "Workplace Violence Expenses" means the reasonable costs, charges, fees and expenses for the following purposes, which are incurred by the **Insured Entity** as a result of any Workplace Violence:

   **(1)** an independent security consultant for ninety (90) days following the date a Workplace Violence occurs;

   **(2)** an independent public relations consultant for ninety (90) days following the date a Workplace Violence occurs;

   **(3)** a counseling seminar for all **Employees** conducted by an independent consultant following a Workplace Violence;

   **(4)** independent security guard services for fifteen (15) days following the date a Workplace Violence occurs; and

   **(5)** an independent forensic analyst for ninety (90) days following the date a Workplace Violence occurs.

    **c.**  "Premises" means the buildings, facilities or properties occupied by an **Insured Entity** in conducting its business.

    **d.**  "**Loss**" includes Workplace Violence Expenses.

**5.**  The Insurer shall not be liable under this endorsement for:

    **a.**  any Workplace Violence which occurs at any location other than the Premises;

    **b.**  **Loss** arising from declared or undeclared war, civil war, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization;

    **c.**  legal costs, judgments and settlements incurred as the result of any claim, suit or judicial action brought against an **Insured Entity** in connection with Workplace Violence; or

    **d.**  **Loss** resulting from the use or threat of force or violence occurring on or in the Premises for the purpose of demanding money, securities or property.

**POLICY NUMBER:** PML0002157 01

**MANAGEMENT LIABILITY**
**PML 11 68 04 20**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL DEFENSE COSTS SEPARATE LIMIT

This endorsement modifies insurance provided under the following:

**SCHEDULE**

**Item 2. of the Directors And Officers And Entity Liability Coverage Part Declarations is amended to include the following:**

| | |
|---|---|
| Directors And Officers And Entity Liability Coverage Part Additional Defense Costs Limit of Liability: | $ |

**Item 2. of the Employment Practices And Third Party Liability Coverage Part Declarations is amended to include the following:**

| | |
|---|---|
| Employment Practices And Third Party Liability Coverage Part Additional Defense Costs Limit of Liability: | $ 1,000,000 |

**Item 2. of the Fiduciary Liability Coverage Part Coverage Part Declarations is amended to include the following:**

| | |
|---|---|
| Fiduciary Liability Coverage Part Additional Defense Costs Limit of Liability: | $ |

**Section IV. Limit Of Liability, Sublimits And Retentions** in **General Terms And Conditions** is replaced by the following:

**IV.    LIMIT OF LIABILITY, SUBLIMITS AND RETENTIONS**

If Item **6.** of the General Terms and Conditions Declarations is elected, then the amount indicated in Item **6.** will be the maximum aggregate amount the Insurer will pay for all **Loss** covered under all **Liability Coverage Parts**, combined, regardless of the number of **Claims** or **Insureds,** other than **Defense Costs** paid under the Additional Defense Costs Limit for the specified **Liability Coverage Part,** provided by this endorsement.

If applicable, the Additional Defense Costs Limit, shown in the Schedule of this endorsement for each **Liability Coverage Part** applies to the Insurer's payment of **Defense Costs** made under each **Liability Coverage Part**, regardless of the number of **Claims** or **Insureds**. Such Additional Defense Costs Limit will not erode that **Liability Coverage Part's** Aggregate Limit of Liability. When the Additional Defense Costs Limit for the applicable **Liability Coverage Part** is exhausted by the Insurer's payment of **Defense Costs**, the Insurer's payment of any **Defense Costs** will then be part of, will erode, and will not be in addition to, the Aggregate Limit of Liability for that **Liability Coverage Part**. The Additional Defense Costs Limit and the Aggregate Limit of Liability for that **Liability Coverage Part**, will be the maximum aggregate amount the Insurer will pay for all **Loss** covered under each **Liability Coverage Part**, regardless of the number of **Claims** or **Insureds**.

If a single **Claim** (as described in Section **VII.** of these General Terms and Conditions) is covered in whole or in part under more than one **Liability Coverage Part**, then the applicable Limits of Liability under each such **Liability Coverage Part** shall be applied separately to the part of such **Claim** covered under the respective Coverage Part, but the Insurer's maximum aggregate liability for all **Loss** covered under all such **Liability Coverage Parts**, combined, on account of such **Claim** shall not exceed the largest of such remaining applicable Limits of Liability. This paragraph does not increase the Insurer's maximum liability with respect to such **Claim**.

Except to the extent otherwise expressly stated in this Policy, any Sublimit of Liability under this Policy is part of and not in addition to any otherwise applicable Limit of Liability, and further limits but does not increase the Insurer's liability under this Policy.

**Defense Costs** are part of and not in addition to the Limit of Liability set forth in Item **6.** of the General Terms and Conditions Declarations or Item **2.** of the respective **Liability Coverage Part** Declarations, other than **Defense Costs** paid under, Additional Defense Costs Limits provided under **Liability Coverage Parts** pursuant to this endorsement.

The Declarations for the respective **Other Coverage Parts** state the maximum amount the Insurer will pay for all loss covered under such **Other Coverage Part**.

Each Coverage Part Declarations states the amount of any applicable Retention under the Coverage Part. Any Retention amount shall be uninsured and the **Insureds'** responsibility to pay. No Retention shall apply to **Loss** incurred by an **Insured Person** for which the **Insured Entities** are not permitted by common or statutory law to indemnify or are not financially able to indemnify by reason of **Financial Insolvency**. If a single **Claim** is subject to more than one Retention, each such Retention shall be applied to the portion of **Loss** subject to each such Retention, but the sum of all Retentions applicable to such **Claim** shall not exceed the largest of such applicable Retentions.

The **Insured Entity** agrees to indemnify its **Insured Persons**, and to advance **Defense Costs** incurred by its **Insured Persons**, to the fullest extent permitted by law.

**POLICY NUMBER:** PML0002157 01

MANAGEMENT LIABILITY
PML 10 51 10 22

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ILLEGAL IMMIGRANT INVESTIGATIVE DEFENSE COSTS SUBLIMIT AND SEPARATE RETENTION ENDORSEMENT

This endorsement amends the General Terms And Conditions and modifies insurance provided under the following:

EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART

#### SCHEDULE

| | | |
|---|---|---|
| **1.** | Illegal Immigrant Investigative Defense Costs Sublimit: | $100,000 |
| **2.** | Each Immigration Reform Act Claim Retention: | $50,000 |

It is understood and agreed that:

**A.** The following Coverage Extension is added to the Employment Practices And Third Party Liability Coverage Part:

Immigration Reform Act Coverage Extension

The Insurer shall pay, on behalf of the **Insureds, Defense Costs,** which the **Insureds** become legally obligated to pay by reason of an **Immigration Reform Act Claim** first made against the **Insureds** during the **Policy Period** or, if applicable, the **Extended Reporting Period** for any **Immigration Reform Act Wrongful Act.**

**B.** The following is added to Section **IV. Limit Of Liability, Sublimits And Retention** in the General Terms And Conditions and is applicable to the Employment Practices And Third Party Liability Coverage Part:

The maximum aggregate amount the Insurer will pay for all **Defense Costs** in connection with all **Immigration Reform Act Claims** based upon or arising from all **Immigration Reform Act Wrongful Acts,** combined, shall be the Illegal Immigrant Investigative Defense Costs Sublimit shown in item **1.** of the Schedule of this endorsement. This Sublimit is part of, and not in addition to, the Aggregate Limit of Liability set forth in **Item 2.** of the Employment Practices And Third Party Liability Coverage Part Declarations.

The retention applicable to each **Immigration Reform Act Claim** shall be the Each Immigration Reform Act Claim Retention amount shown in item **2.** of the Schedule of this endorsement.

Notwithstanding anything to the contrary in the Policy, if more than one Retention applies to a single **Claim,** the largest applicable Retention shall apply to such **Claim.**

**C.** Section **II. Definitions** in the Employment Practices And Third Party Liability Coverage Part is amended as follows:

    **1.** The following is added to the definition of **Claim:**

        **Claim** also means, including if applicable any appeal therefrom, solely with respect to the Immigration Reform Act Coverage Extension**,** in Paragraph **A.** of this endorsement, any **Immigration Reform Act Claim.**

    **2.** The first paragraph in the definition of **Employment Claim** is replaced by the following:

        **Employment Claim** means any of the following which are brought and maintained against an **Insured** by or on behalf of any past, present, prospective or alleged **Employee** or **Executive** or applicant for employment by an **Insured Entity,** including if applicable any appeal therefrom, alleging an **Employment Practices Wrongful Act** with respects to Insuring Agreement **A.1.** or an **Employment Contract Breach** with respects to Insuring Agreement **A.2.:**

**PML 10 51 10 22**

**Page 1 of 2**

**3.**  The following is added to the definition of **Wrongful Act:**

**Wrongful Act** means solely with respect to the coverage provided by this endorsement, any actual or alleged **Immigration Reform Act Wrongful Act.**

**4.**  The following definitions are added:

**Immigration Reform Act Claim** means a criminal investigation or audit of an **Insured** by any governmental authority alleging an **Immigration Reform Act Wrongful Act** commenced by the service upon or other receipt by the **Insured** of a written notice, target letter or other written notice from the investigating authority, which names the **Insured** as a target or subject of such proceeding.  **Immigration Reform Act Claim** shall not include any labor or grievance arbitration or other proceeding pursuant to or governed by a collective bargaining agreement.

**Immigration Reform Act Wrongful Act** means any actual or alleged violation of the Immigration Reform and Control Act of 1986 (IRCA), as amended, or any similar federal, state, local or foreign law or common law with respects to the hiring or harboring illegal immigrants.

**D.**  The following is added to Section **III. Exclusions** in the Employment Practices And Third Party Liability Coverage Part:

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim** based upon or arising from any **Immigration Reform Act Wrongful Act**, provided with respect to **Immigration Reform Act Claims** covered under the Immigration Reform Act Coverage Extension, this exclusion shall not apply to **Defense Costs** incurred up to the Illegal Immigrant Investigative Defense Costs Sublimit shown in item **1.** of the Schedule of this endorsement.

**POLICY NUMBER: PML0002157 01**                              MANAGEMENT LIABILITY
                                                                    PML 12 94 09 21

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# BIOMETRICS EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

    DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART
    EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART

It is understood and agreed:

**A.**  The following is added to **Section III. Definitions** of the General Terms And Conditions:

    **Biometric Personal Information** means any physical, morphological, biological or behavioral characteristics information, data or identifiers of an individual, including but not limited to finger, hand, voice, facial, heart rate, DNA, retinal or iris characteristics or any other biometric algorithm or measurement of the foregoing which allows an individual to be uniquely identified.

**B.**  The following is added to the **Exclusions** Section of each **Liability Coverage Part**:

    The Insurer shall not be liable to pay any **Loss** in connection with any **Claim** based upon or arising from any actual or alleged violation of the Biometric Information Privacy Act ("BIPA"), the California Consumer Privacy Act ("CCPA") or any federal, state, local or foreign law or common law concerning the collection, storage, retention, access, use, destruction, disclosure, dissemination, sale, lease, or trade of any kind of any **Biometric Personal Information** by the **Insured** or by any individual or entity acting by, on behalf of or at the direction of the **Insured**.

POLICY NUMBER:  PML0002157 01

**MANAGEMENT LIABILITY**
**PML M0 01 07 23**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WAGE AND HOUR SUBLIMIT AND SEPARATE RETENTION INCLUDING LOSS FOR CLASS ACTIONS ENDORSEMENT

Named Insured:  Wayfarer Studios
Endorsement Effective Date:  07-15-2024
Premium: ■                    ☐ Fully Earned            ☐ Flat Charge

This endorsement amends the General Terms And Conditions and modifies insurance provided under the following:

EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART

**SCHEDULE**

| | |
|---|---|
| **1.**   Wage and Hour Claims Sublimit: | $100,000 |
| **2.**   Wage and Hour Claim Retention:   - | |
| **A.**   Wage and Hour Claim Retention Amount for **Claims** brought in the following state(s): California | |
| **(1)**  Each **Claim** other than a **Class Action:**   - | $50,000          - |
| **(2)**  Each **Class Action:**   - | $50,000          - |
| **B.**   Wage and Hour Claim Retention Amount for **Claims** brought in all states other than the states shown in **2.A.** above: | |
| **(1)**  Each **Claim** other than a **Class Action:**   - | $50,000          - |
| **(2)**  Each **Class Action:**   - | $50,000          - |
| **3.**   Wage and Hour Pending or Prior Litigation Date: | |

It is understood and agreed that:

**A.**   The following Coverage Extension is added:

<u>Wage And Hour Matter Coverage</u>

PML M0 01 07 23                                                                    **Page 1 of 3**

1.    The Insurer shall pay, on behalf of the **Insured Entity, Defense Costs** which an **Insured Entity** becomes legally obligated to pay by reason of a **Claim** that is only a **Wage and Hour Claim** and which is not a **Class Action** first made against such **Insured Entity** during the **Policy Period** or, if applicable, the **Extended Reporting Period.**

2.    The Insurer shall pay, on behalf of the **Insured Entity, Loss** which an **Insured Entity** becomes legally obligated to pay by reason of a **Claim** that is only a **Wage and Hour Claim** which is a **Class Action** first made against such **Insured Entity** during the **Policy Period** or, if applicable, the **Extended Reporting Period.**

    **B.**    The following is added to Section **IV. Limit Of Liability, Sublimits And Retentions** of the General Terms And Conditions and is applicable to the Employment Practices And Third Party Liability Coverage Part:

    The maximum aggregate amount the Insurer will pay for all **Defense Costs** covered pursuant to Paragraph **A.1.** and all **Loss** covered pursuant to Paragraph **A.** of this endorsement in connection with all **Wage and Hour Claims** based upon or arising from all **Wage and Hour Matters,** combined, shall be the Wage And Hour Claims Sublimit shown in item **1.** in the Schedule of this endorsement. This is a sublimit which shall be part of and not in addition to, the Aggregate Limit of Liability set forth in **Item 2.** of the Employment Practices And Third Party Liability Coverage Part Declarations.

    The Retention applicable to each **Wage and Hour Claim** described in this endorsement**,** including a **Wage and Hour Claim** that is a **Class Action,** shall be the applicable Wage and Hour Claim Retention shown in item **2.** in the Schedule of this endorsement.

    Notwithstanding anything to the contrary in the Policy, if more than one Retention applies to a single **Claim,** the largest applicable Retention shall apply to such **Claim.**

    **C.**    Section **II. Definitions** is amended as follows:

        **1.**    The following is added to the definition of **Claim:**

        **Claim** also means, including if applicable any appeal therefrom, solely with respect to the Wage and Hour Matter Coverage Extension in Paragraph **A.** of this endorsement, any **Wage and Hour Matter.**

        2.    The first paragraph in the definition of **Employment Claim** is replaced by the following:

        **Employment Claim** means any of the following which are brought and maintained against an **Insured** by or on behalf of any past, present, prospective or alleged **Employee** or **Executive** or applicant for employment by an **Insured Entity,** including if applicable any appeal therefrom, alleging an **Employment Practices Wrongful Act** with respect to Insuring Agreement **A.1.** or an **Employment Contract Breach** with respect to Insuring Agreement **A.2.:**

        3.    The following is added to the definition of **Wrongful Act:**

        **Wrongful Act** means solely with respect to the coverage provided by this endorsement, any actual or alleged **Wage and Hour Matter.**

**4.**    The following definition is added:

        **Wage and Hour Claim** means any of the following which are brought and maintained against an **Insured** by or on behalf of any past, present, prospective or alleged **Employee** or applicant for employment by an **Insured Entity,** including if applicable any appeal therefrom alleging a **Wage and Hour Matter:**

        **a.    a written demand against an Insured for monetary damages or non-monetary or injunctive relief, commenced by the Insured's receipt of such demand;**

        **b.    a civil proceeding against an Insured, commenced by the service of a complaint or similar pleading upon the Insured;**

        **c.    an administrative or regulatory proceeding or administrative or regulatory investigative proceeding against an Insured, commenced by the filing of a notice of charges, formal investigative order or similar document which names the Insured as a target or subject of such proceeding;**

    **d.**  an arbitration, mediation or other alternative dispute resolution proceeding against an Insured, commenced by the Insured's receipt of a demand for arbitration or mediation or similar document; or

    **e.**  a written demand that an Insured toll or waive a statute of limitations relating to a potential Wage and Hour Claim otherwise described in this definition, commenced by the Insured's receipt of such demand.

**Wage and Hour Claim** shall not include any labor or grievance arbitration or other proceeding pursuant to or governed by a collective bargaining agreement.

**D.**  Section **III. Exclusions** is amended as follows:

  1.  Exclusion **A.1.c.** is deleted.

  2.  The following exclusion is added:

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim** based upon or arising from any **Wage and Hour Matter;** provided:

    **a.**  with respect to the coverage provided under Paragraph A.1. of this endorsement, this exclusion will not apply to Defense Costs incurred up to the Wage and Hour Claims Sublimit shown in item 1. in the Schedule of this endorsement;

    **b.**  with respect to the coverage provided under Paragraph **A**.2. of this endorsement, this exclusion will not apply to **Loss** incurred up to the Wage and Hour Claims Sublimit shown in item **1.** in the Schedule of this endorsement.

    This exclusion will not apply to any **Employment Claim** on account of **Retaliation.**

**E.**  The Pending or Prior Litigation Date applicable to each **Wage and Hour Claim** shall be the Wage and Hour Pending or Prior Litigation Date shown in item **3.** in the Schedule of this endorsement. Notwithstanding the foregoing, if no Wage and Hour Pending or Prior Litigation Date is shown in the Schedule of this endorsement, the applicable Pending or Prior Litigation Date for each **Wage and Hour Claim** shall be the Pending or Prior Litigation Date set forth in **Item 4.** in the Employment Practices And Third Party Liability Coverage Part Declarations.

POLICY NUMBER:  PML0002157 01

**MANAGEMENT LIABILITY**
**PML M0 02 07 23**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ABUSE OR MOLESTATION EXCLUSION ENDORSEMENT – (EPL)

Named Insured:  Wayfarer Studios
Endorsement Effective Date:  07-15-2024
Premium: ■                    ☐ Fully Earned                    ☐ Flat Charge

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART

It is understood and agreed that the following is added to **Section III. Exclusions** of the Employment Practices And Third Liability Coverage Part:

Abuse or Molestation

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim** based upon or arising from any actual, alleged, attempted or threatened sexual molestation, abuse, assault, or battery, whether or not intentional, of any natural person.

POLICY NUMBER:  PML0002157 01

**MANAGEMENT LIABILITY**
**PML M0 03 07 23**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MEDIA AND BROADCASTING SERVICES EXCLUSION ENDORSEMENT – PRIVATE COMPANY

Named Insured:  Wayfarer Studios
Endorsement Effective Date:  07-15-2024
Premium: ■                    ☐ Fully Earned                    ☐ Flat Charge

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART-PRIVATE COMPANY

It is understood and agreed that:

**A.**  Section **III. Definitions** is amended as follows:

1.  The following is added to the definition of **Loss**:

**Loss** does not include the cost to recall, recover, correct, restore, repair, replace, reproduce, reprint or ship materials or data.

2.  The definition of **Professional Services** is replaced by the following:

**Professional Services** mean:

**a.**  the **Insured's** performance of, or failure to perform, services for others for a fee or other remuneration, including any **Media Or Broadcasting Services;** or

**b.**  services that may be legally performed only by an individual holding a professional license, regardless of whether the person is licensed or not.

3.  The following definitions are added:

**Media Or Broadcasting Services** means:

**a.**  the creation, production or assembly; or

**b.**  distribution, dissemination, expression, publication, release, or transmittal**;**

of **Content** by or on behalf of any **Insured.**

**Content** means words, numbers, images, graphics, ideas, data, text, sounds, or similar forms of expression,or any kind of communicative or informational materialregardless of its nature, intent or form, including but not limited to any:

**a.**  publication, correspondence, script, plays,encyclopedia, dictionary, businessrecord,or researchmaterial;

**b.**  recorded or live music,film,podcast, speech, televisionorradioexcerpts,commercial,voiceover,soundeffect,orspeech;

    **c.** online video, webcast, podcast, blog, onlineforums or chat room;

    **d.** televisionbroadcast, infomercial, videos,oranimatedandmotionpicture;or

    **e.** any picture, graphic, sculpture, photographs, poster, map, painting, drawing,cartoons,statue,worksoffineart,displayadvertisement,orarchitecturaldrawing.

    **Over Redemption Or Under Redemption** means price discounts, prizes, awards or other valuable consideration given in excess of or below the total contracted, expected or posted amount.

**B.** Section **IV. Exclusions** is amended as follows:

  **1.** Exclusion **B. 5. Personal Injury** is deleted in its entirety and replaced by the following:

    **5.** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim** based upon or arising from any **Personal Injury**; provided this exclusion does not apply to any **Securityholder Claim**.

  **2.** Exclusion **B. 7. Professional Services** is deleted in its entirety and replaced by the following:

    **7.** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim** based upon or arising from any **Professional Services**; provided this exclusion does not apply to any **Securityholder Claim**.

  **3.** The following exclusions are added:

    **a.** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim,** brought by or orders imposed byor from anycontentlicensingorganizationoragency,includingwithoutlimitationthe American Society of Composers, Authors and Publishers (ASCAP), Society of European Stage Authorsand Composers (SESAC), Broadcast Music, Inc. (BMI), Recording Industry Association of America (RIAA), or any othermediaor contentlicensingorganizations;

    **b.** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim** based upon or arising from any:

      **(1)** failure of goods, products, brands or services to conform with any statements, representations or anyexpressorimpliedwarrantiesmadeinadvertising(including,butnotlimitedto marketing material or advertisingvianewspapers, magazines, journals, broadcast, radio, television, internet, social media, mailers, contests,sponsorships, endorsements andposters),promotions,or marketing;

      **(2)** incorrect,inadequateormisleadingdescriptionofgoods,products, pricing,brandsorservicesinthe**Insured's** advertising,marketing, labeling, promotions, orbroadcasting;

      **(3)** contests, sweepstakes, gambling, lotteries or other games of chance, coupon distribution programs or the **Over Redemption Or Under Redemption** of coupons, rebates, discounts, prizes or awards;

      **(4)** actualorallegedobligationtomakelicensingfeeorroyaltypayments; or

      **(5)** design, construction, hosting or maintenance of any web site.

POLICY NUMBER:  PML0002157 01                                                PML M0 03 07 23

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES AND THIRD PARTY LIABILITY COVERAGE PART
FIDUCIARY LIABILITY COVERAGE PART
CYBER COVERAGE PART

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss that is otherwise excluded under this Coverage Part.

**MANAGEMENT LIABILITY**
**PML 12 41 10 20**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ABSOLUTE BODILY INJURY EXCLUSION - PRIVATE COMPANY

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART - PRIVATE COMPANY

It is understood and agreed that Exclusion **C.3.** in Section **IV**. is amended to read in its entirety as follows:

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim** based upon or arising from **Bodily Injury**; provided this exclusion does not apply to:

    **a.**  Insuring Agreement **A.** of this Coverage Part;

    **b.**  any **Securityholder Claim**;

    **c.**  any actual or alleged emotional distress, mental anguish or humiliation made in connection with any **Employment Related Claim** against an **Insured Person**; or

    **d.**  **Defense Costs** incurred by an **Executive** in the defense of a **Claim** for any actual or alleged violation of a corporate manslaughter statute by such **Executive**.

**MANAGEMENT LIABILITY**
**PML 12 95 10 22**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DEFENSE, COOPERATION AND CONSENT AMENDED ENDORSEMENT

This endorsement amends the General Terms And Conditions and modifies insurance provided under the **Liability Coverage Parts.**

It is understood and agreed that **Section VIII. Defense, Cooperation And Consent** is replaced by the following:

**VIII.    DEFENSE, COOPERATION AND CONSENT**

The Insurer shall have the right and duty to defend any **Claim** against the **Insureds** which is covered by the **Liability Coverage Parts** including the right to select defense counsel with respect to such **Claim,** even if the allegations in the **Claim** are groundless, false or fraudulent. The Insurer's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

The **Insureds** shall:

**A.**    provide to the Insurer all cooperation, assistance and any information which the Insurer may reasonably request;

**B.**    not do anything that may increase the Insurer's liabilities or prejudice the Insurer's potential or actual rights of recovery or subrogation; and

**C.**    not incur any **Defense Costs**, admit any liability or assume any contractual obligation, accept or consent to any settlement, make any offer of settlement or stipulate to any judgment, without the Insurer's prior written consent.

The Insurer:

**A.**    shall have the right to make any reasonable investigation of any **Claim** or **Noticed Matter** that the Insurer deems necessary or appropriate;

**B.**    may make any settlement of any **Claim** that the Insurer deems reasonable, provided any **Insured** consents to such settlement;

**C.**    shall not withhold its written consent unreasonably; and

**D.**    shall not be liable for any **Loss** for which the **Insureds** must obtain the Insurer's consent as described above unless the Insurer provides its prior written consent thereto.

**MANAGEMENT LIABILITY**
**PML 12 96 10 22**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# INSURED VS. INSURED EXCLUSION AMENDED ENDORSEMENT (INCLUDING CREDITORS COMMITTEE CARVEBACK) - PRIVATE COMPANY

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE PART – PRIVATE COMPANY

It is understood and agreed that:

**A.** The definition of **Securityholder Derivative Suit** in Section **III. Definitions** is replaced by the following:

**Securityholder Derivative Suit** means a lawsuit brought derivatively on behalf of an **Insured Entity** by one or more securityholders of such **Insured Entity** who are not **Executives** against **(i)** one or more **Executives** of such **Insured Entity;** or **(ii)** the **Insured Entity** as a nominal defendant.

**B**. Paragraph **D.** in Section **IV. Exclusions** is replaced by the following:

**D.** brought or maintained by or on behalf of any **Insured** in any capacity against any other **Insured,** or by or on behalf of an **Outside Entity** against any **Insured,** unless such **Claim** is:

**1.** a **Securityholder Derivative Suit** or a derivative suit brought on behalf of an **Outside Entity** against an **Insured Person** in his/her **Outside Position** for such **Outside Entity,** as long as such **Claim** is brought and maintained without any active assistance, participation of, or solicitation by, any **Executive;**

**2.** brought by an **Employee,** other than an **Executive,** but solely in his or her capacity as a securityholder of an **Insured Entity,** as long as such **Claim** is brought and maintained without any active assistance, participation of, or solicitation by, any **Executive;**

**3.** brought by or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver, conservator, liquidator, similar official or creditors committee for such **Insured Entity** or **Outside Entity,** or any assignee of such trustee, examiner, receiver, conservator, liquidator, similar official or creditors committee;

**4.** brought by an **Executive** who has not been in his/her insured capacity for at least one (1) year immediately prior to such **Claim** being made;

**5.** for contribution or indemnity arising from a **Claim** otherwise covered under this Policy;

**6.** brought against an **Insured Person** based upon or arising from **Whistleblower Activity** by such **Insured Person;**

**7.** an **Employment Related Matter Claim** (other than a **Claim** for **Wage and Hour Matters**) against an **Insured Person;** or

**8.** brought or maintained in a common law jurisdiction other than the United States or Canada, their territories or possessions.

MANAGEMENT LIABILITY
PML 11 78 04 20

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

**A.** Paragraphs **A.2.** and **3.** and **B.** in **Section XI. Cancellation, Termination Or Non-Renewal** are replaced by the following:

**2. Cancellation By Insurer**

**a. All Policies In Effect For 60 Days Or Less**

If this Policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this Policy by mailing or delivering to the **Named Insured**, at the mailing address shown in the Policy, and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for:

**(a)** Nonpayment of premium; or

**(b)** Discovery of fraud by:

**(i)** Any **Insured** or his or her representative in obtaining this insurance; or

**(ii)** The **Named Insured** or the **Named Insured** representative in pursuing a **Claim** under this Policy.

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**b. All Policies In Effect For More Than 60 Days**

**(1)** If this Policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this Policy only upon the occurrence, after the effective date of the Policy, of one or more of the following:

**(a)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(b)** Discovery of fraud or material misrepresentation by:

**(i)** Any **Insured** or his or her representative in obtaining this insurance; or

**(ii)** The **Named Insured** or the **Named Insured** representative in pursuing a **Claim** under this Policy.

**(c)** A judgment by a court or an administrative tribunal that the **Named Insured** has violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

**(d)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the **Named Insured** or the **Named Insured's** representative, which materially increase any of the risks insured against.

**(e)** Failure by the **Named Insured** or the **Named Insured's** representative to implement reasonable loss control requirements, agreed to by the **Named Insured** as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(f)** A determination by the Commissioner of Insurance that the:

    **(i)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

    **(ii)** Continuation of the policy coverage would place us in violation of California law or the laws of the state where we are domiciled or threaten our solvency.

**(g)** A change by the **Named Insured** or the **Named Insured's** representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the Policy.

**(2)** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the **Named Insured** at the mailing address shown in the Policy, and to the producer of record, at least:

    **(a)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

    **(b)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph **2.b.(1)** of this endorsement.

**B.** If this Policy is canceled, the Insurer will promptly send to the **Named Insured** the unearned premium computed pro rata. The cancellation will be effective even if the Insurer has not made or offered a premium refund.

**B.** Paragraph **C.** in **Section XI. Cancellation, Termination Or Non-Renewal** is replaced by the following:

**Nonrenewal**

**1.** Subject to the provisions of Paragraph **2.** of this Nonrenewal paragraph, if we elect not to renew this Policy, we will mail or deliver written notice, stating the reason for nonrenewal, to the **Named Insured** shown in the Declarations, and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the **Named Insured**, and to the producer of record, at the mailing address shown in the Policy.

**2.** We are not required to send notice of nonrenewal in the following situations:

**a.** If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between us and a member of our insurance group.

**b.** If the Policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **1.** of this Nonrenewal paragraph.

**c.** If the **Named Insured** has obtained replacement coverage or has agreed, in writing, within 60 days of the termination of the Policy, to obtain that coverage.

**d.** If the Policy is for a period of no more than 60 days and the **Named Insured** is notified at the time of issuance that it will not be renewed.

**e.** If the **Named Insured** requests a change in the terms or conditions or risks covered by the Policy within 60 days of the end of the **Policy Period**.

**f.** If we have made a written offer to the **Named Insured**, in accordance with the time frames shown in Paragraph **1.** of this Nonrenewal paragraph, to renew the Policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

**C.** The definition of **Loss** in the **Definitions Section** in all **Liability Coverage Parts** is amended as follows:

**1.** **Loss** is amended so that it does not include punitive, exemplary or multiple damages.

**2.** The following paragraph is deleted from the definition of **Loss**:

The insurability of punitive, exemplary or multiple damages, fines or penalties otherwise covered under this Coverage Part shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insureds**, including without limitation the jurisdiction in which the **Named Insured**, the **Insured Persons**, the Insurer, this Policy or such **Claim** is located or has a substantial relationship.