# Exhibit 2

1   Kirk Pasich (SBN 94242)
    KPasich@McGuireWoods.com
2   Caitlin S. Oswald (SBN 330974)
    COswald@McGuireWoods.com
3   Eliza J. Logan (SBN 353753)
    ELogan@McGuireWoods.com
4   McGUIREWOODS LLP
5   1800 Century Park East, 8th Floor
    Los Angeles, California 90067
6   Telephone:  (310) 315-8200
7   Facsimile:   (310) 315-8210

8   Aleksandra Kaplun (*Pro Hac Vice* forthcoming)
9   AKaplun@McGuireWoods.com
    McGUIREWOODS LLP
10  1251 Avenue of the Americas, 20th Floor
    New York, New York  10020
11  Telephone:  (212) 548-2100
    Facsimile:   (212) 548-2150
12
13  Attorneys for Plaintiffs

Electronically FILED by
Superior Court of California,
County of Los Angeles
7/30/2025 4:50 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By D. Williams, Deputy Clerk

14                 **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

15                     **FOR THE COUNTY OF LOS ANGELES**

16

17  WAYFARER STUDIOS LLC, IT ENDS           Case No. 25STCV22519
    WITH US MOVIE LLC, JUSTIN BALDONI,
18  JAMEY HEATH, and STEVE SAROWITZ,

19                          Plaintiffs,      **COMPLAINT FOR BREACH OF
20                                           CONTRACT, BAD FAITH, AND
            vs.                              DECLARATORY RELIEF**

21  NEW YORK MARINE AND GENERAL             **DEMAND FOR JURY TRIAL**
22  INSURANCE COMPANY, QBE
    INSURANCE CORPORATION, and
23  CERTAIN UNDERWRITERS AT LLOYD'S
    AND OTHER INSURERS SUBSCRIBING
24  TO POLICY NUMBER ESN0140179884,

25                          Defendants.

26

27

28

                                    **COMPLAINT**

1    Plaintiffs Wayfarer Studios LLC ("Wayfarer"), It Ends With Us Movie LLC ("IEWUM"),

2  Justin Baldoni, Jamey Heath, and Steve Sarowitz (collectively, "the Insureds") complain of

3  defendants New York Marine and General Insurance Company ("New York Marine"), QBE

4  Insurance Group Limited ("QBE"), and Certain Underwriters at Lloyd's and Other Insurers

5  subscribing to Policy No. ESN0140170884 (the "Underwriters) (collectively, the "Insurers"), and

6  allege as follows:

7                          **NATURE OF THE ACTION**

8    1.    The Insurers sold Wayfarer and IEWUM insurance policies promising to defend

9  and indemnify the Insureds against, among other things, lawsuits alleging defamation.  After the

10  Insureds were sued by Blake Lively in a lawsuit alleging defamation and various other claims, the

11  Insureds notified the Insurers and requested that the Insurers defend them and otherwise honor

12  their duties under their policies.  However, instead of doing so, the Insurers ignored their duty to

13  defend while they purported to "investigate."  They then denied coverage, breaching their duties,

14  refusing to honor of their duties to the Insureds.  Therefore, the Insurers are liable for breach of

15  contract and tortious bad faith, and are liable to their Insureds for compensatory, consequential,

16  and punitive damages.

17                              **THE PARTIES**

18    2.    Wayfarer is a Delaware limited liability company with its principal place of

19  business in Los Angeles, California.

20    3.    IEWUM is a California limited liability company with its principal place of

21  business in Los Angeles, California. IEWUM is wholly owned by Wayfarer.

22    4.    Justin Baldoni is a California resident.  He acted in and directed the movie *It Ends*

23  *With Us*.  He is also a member of Wayfarer.

24    5.    Jamey Heath is a California resident.  He is the CEO of Wayfarer and provided

25  producing services for *It Ends With Us*.

26    6.    Steve Sarowitz is an Illinois resident.  He is a member of Wayfarer.

27    7.    The Insureds are informed and believe, and on that basis allege, that New York

28  Marine is a corporation organized under the laws of the state of New York with its principal place

of business in Morristown, NJ.  The Insureds are informed and believe, and on that basis allege, that New York Marine is part of the Coaction Specialty Insurance Company group of insurance companies ("Coaction").  The Insureds are informed and believe, and on that basis allege, that on its website, Coaction makes statements and representation on behalf of its member companies, including New York Marine, including the following:

- "We specialize in helping businesses reach their maximum potential with insurance solutions tailored for their needs."[1]

- "Coaction Specialty® has been writing Entertainment business for over a decade with a team of experts located in Southern California, New York, and New Jersey who have dedicated their entire careers (over 300 years of collective experience) to these customers."[2]

- "When you report a claim, our best-in-class team responds with attentive, efficient service. They create a plan of action around your claim that ranges from gathering facts and data to investigation and reporting. They meticulously guide you through the entire process with the goal of achieving the best possible outcome."[3]

8.    The Insureds are informed and believe, and on that basis allege, that QBE is a Pennsylvania company with its principal place of business in Sun Prairie, WI.  The Insureds are informed and believe, and on that basis allege, that QBE is part of the QBE North America ("QBE-NA") division of the QBE Group.  The Insureds are informed and believe, and on that basis allege, that on its website, QBE-NA makes statements and representations on behalf of its member companies, including QBE, including the following:

- "We don't just see ourselves as an insurer, but a partner to our customers in helping them to navigate uncertainty. We provide tailored solutions across commercial and

---

[1] Coaction Specialty Insurance - Specialty Insurance.

[2] Entertainment Insurance - Coaction Specialty Insurance

[3] Claims | Specialty Insurance | Coaction.

specialty products, as well as risk management solutions to help individuals and businesses manage risks, build strength and embrace change."[4]

- "Promises kept: Every customer is unique and every claim is different. We work closely with our customers to quickly and efficiently deliver the best outcome their coverage provides, every time. Having a partnership with QBE gives our customers the confidence to know that their lives and businesses won't be stopped by a claim. A loss resulting in a claim is a pivotal moment of truth in each relationship – it's the moment when promises are put to the test. That's why our Claims organization is committed to providing the expertise, service, technical knowledge, and guidance needed to resolve claims quickly and keep our customers moving toward their next ambition."[5]

- "At QBE, we're striving for greater consistency across everything we do. Our aim is to do things more consistently than our competitors, whether it's in the experience we provide our customers and partners, the performance of our business or the values that connect our people."[6]

9. The Underwriters subscribing to Policy Number ESN0140179884 (the "Lloyd's Policy") are syndicates or members of one or more syndicates and insurers that have subscribed to the Lloyd's Policy and that have agreed, and are obligated, to provide the insurance afforded by the Lloyd's Policy.  The Insureds are informed and believe, and on that basis allege, that many of the Underwriters reside in England or other foreign countries, but do not know their citizenships or residences.  However, the Insureds are informed and believe, and on that basis allege, that the Underwriters transact business and sell insurance covering risks in the State of California and across the United States.

---

[4] About QBE | QBE US.

[5] Our claims promise | QBE US.

[6] Our purpose and vision | QBE US.

10.    The Insureds are informed and believe, and on that basis allege that the Underwriters are members of the Lloyd's of London insurance market, located in London, England. Lloyd's "is a market in which independent insurance underwriters join together in syndicates to sell insurance, mainly through brokers, under the umbrella of the Lloyd's brand name."[7]

11.    Lloyd's makes representations on its website about why insureds should buy insurance from members of its market.  These representations include the following:

- "The Lloyd's market provides the leadership and insight to anticipate and understand risk, and the knowledge to develop relevant, new and innovative forms of insurance for customers globally"

- "And it promises a trusted, enduring partnership built on the confidence that Lloyd's protects what matters most: helping people, businesses and communities to recover in times of need"

- "**Why Lloyds?**  Our competitive market helps to ensure you receive the best possible outcomes across price, coverage and service – strengthening the value you get form your policy."

- "Lloyd's core business is to protect from disaster, and the fast and fair payment of claims. For over three centuries the security of Lloyd's has protected what matters most to people, businesses and communities and helped them recover in times of need"

- "The Lloyd's market offers the best experience for our customers, with a claims service that has your interests at heart.

- Quite simply, Lloyd's has built its global reputation by upholding its promise to pay all valid claims for more than three centuries. It's what sets Lloyd's apart, and it's done by providing unparalleled security, global strength, exceptional service and world-class expertise for customers globally.

[7] *Her Majesty's Revenue & Customs internal manual, Lloyd's Manual* (Sept. 25, 2019), LLM1010 - Introduction to Lloyd's: background - HMRC internal manual - GOV.UK, (visited July 22, 2025)

1    **We call it the Lloyd's standard.**" [8]

2    **THE *LIVELY* LAWSUIT**

3    12.    On December 20, 2024, Blake Lively filed a complaint with the California Civil

4    Rights Department against Wayfarer, Mssrs. Baldoni, Heath, and Sarowitz, and others.

5    13.    On December 21, 2024, the New York Times published an article titled, *We Can*

6    *Bury Anyone': Inside a Hollywood Smear Machine*", which outlined "an alleged campaign to

7    tarnish Blake Lively after she accused Justin Baldoni of misconduct on the set of "'It Ends With

8    Us.'"[9]

9    14.    On December 31, 2024, Ms. Lively filed a lawsuit in the United States District

10    Court in the Southern District of New York against the Insureds and others (the "*Lively* Lawsuit").

11    15.    Also on December 31, 2024, as part of their defense against Ms. Lively's claims,

12    Wayfarer, Mssrs. Baldoni, Heath, and Sarowitz, and certain others filed a lawsuit in Superior

13    Court of Los Angeles against The New York Times, alleging libel, false light invasion of privacy,

14    promissory fraud, and breach of implied-in-fact contract (the "California Lawsuit").

15    16.    On January 16, 2025, as part of their defense against the *Lively* Lawsuit, several of

16    the Insureds filed a lawsuit (the *"*Responsive Lawsuit") against Ms. Lively and certain others in

17    the Southern District of New York.

18    17.    On January 30, 2025, the court consolidated the *Lively* Lawsuit and the Responsive

19    Lawsuit.

20    18.    On January 31, 2025, several of the Insureds filed a First Amended Complaint in

21    the Responsive Lawsuit. Given the overlap in the issues in the *Lively* Lawsuit and the Responsive

22    Lawsuit, on the one hand, and the allegations in the California Lawsuit, on the other hand, the

23    California Lawsuit plaintiffs dismissed the California Lawsuit. On February 18, 2025, Ms. Lively

24

25

26    _____
      [8] *Welcome to Lloyd's* (2025), Welcome to Lloyd's (visited July 22, 2025).

27    [9] Megan Twohey, Mike McIntire, & Julie Tate, *We Can Bury Anyone': Inside a Hollywood Smear*

28    *Machine*, N.Y. TIMES (Dec. 21, 2024), Blake Lively, Justin Baldoni and a Smear Campaign After 'It Ends With Us' - The New York Times.

1  filed an Amended Complaint in the *Lively* lawsuit.  A true and correct copy of the Amended

2  Complaint is attached hereto as Exhibit A and incorporated by reference.

3      19.    The *Lively* Amended Complaint includes causes of action for retaliation, false light

4  invasion of privacy, and defamation.  It includes the following allegations:

5  •  The defendants perpetuated an ongoing "social manipulation" campaign designed

6     to retaliate against Ms. Lively by destroying her reputation;

7  •  The defendants launched a "coordinated campaign to cast Ms. Lively in a false

8     light during the publicity and promotion of the Film;"

9  •  The defendants compiled a Scenario Planning Document, which, among other

10    things referred to Mr. Baldoni's *Man Enough Podcast* as one of the "Key

11    Messaging Points" of the planning and strategy;

12 •  The Scenario Planning Document was a strategy to "advance misleading

13    counternarratives;"

14 •  The defendants "publicly disclosed information and material regarding Ms.

15    Lively's marketing decisions, moral character, private life and family, which

16    showed Ms. Lively in a false light;"

17 •  The defendants "intentionally made false statements of fact and false statements

18    that conveyed a false meaning about Ms. Lively;"

19 •  The defendants made statements that "are reasonably understood to state and imply

20    that Ms. Lively fabricated claims of harassment and filed false claims of

21    harassment with the Civil Rights Department of the State of California and with the

22    Court;"

23 •  The defendants made statements "suggesting that [Ms. Lively] fabricated serious

24    claims of workplace sexual harassment on behalf of herself and others for no

25    reason other than to take creative control of the Film, threatened individuals

26    associated with her work, and acted as a bully who leveraged her position as an

27    actress;" and

28

- The defendants published these false statements despite knowing that Ms. Lively had reported the same claims during filming that have been raised in the Complaint, and despite being aware that there were multiple other complaints raised by individuals other than Ms. Lively during the shooting of the Film.

Exh. A ¶¶ 26, 372, 390, 398, 435, 448, 463, 466, 467 &; Exh. D therein (Scenario Planning – It Ends With Us).

20.    The *Lively* Lawsuit was widely publicized on its filing. Lively's complaints immediately appeared in the New York Times and quickly spread to all major publications and social media outlets worldwide.  Media coverage was, and remains, intense, and has garnered near daily press coverage since inception.

21.    The Insureds are informed and believe, and on that basis allege, that the Insurers had, or should have had, actual or constructive notice of the *Lively* Lawsuit and its allegations against the Insureds on or shortly after its filing.  Despite that notice, the Insurers did not contact the Insureds, request information from the Insureds, offer to defend the Insureds, or otherwise assume any duties that they might owe the Insureds under their Policies.  Instead, they left the Insureds on their own to defend against the *Lively* Lawsuit, incurring substantial amounts of defense costs and attorneys' fees without their support.

22.    Wayfarer and IEWUM have been paying for the defense of Mssrs. Baldoni, Heath, and Sarowitz in the *Lively* lawsuit.  They are entitled to be reimbursed for all such defense fees and costs they have paid.

**THE NEW YORK MARINE POLICIES**

23.    New York Marine issued three Commercial General Liability Coverage insurance policies to ITWUM.  These policies, numbers PK202300026809 (with a policy period of February 21, 2023, to May 30, 2024), PK202400026809 (with a policy period of May 30, 2024, to August 31, 2024)), and PK202400030251 (with a policy period of August 31, 2024, to August 31, 2025) (the "New York Marine Policies"), have substantially identical terms. The New York Marine Policies insure the Insureds.

24.     Each of the New York Marine Policies contains multiple coverage parts, each of which provides several separate coverages to the Insureds.  The Commercial General Liability Coverage part of each of the New York Marine Policies promises $1,000,000 of insurance "Per Occurrence" for "bodily injury and property damage" and $1,000,000 of insurance for "Personal & Advertising Injury," subject to a $2,000,000 General Aggregate limit, with defense costs to paid in addition to these amounts. New York Marine Policies, Commercial General Liability Declarations: Limits of Insurance; Section I, Coverage A (1); Section I, Coverage B (1).

25.     The New York Marine Policies' Commercial General Liability Coverage Form's "Coverage B Personal and Advertising Liability" obligates New York Marine to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." *Id.,* Section I, Coverage B (1).

26.     The New York Marine Policies also obligate New York Marine to "defend the insured against any 'suit' seeking those damages." *Id.*

27.     The New York Marine Policies define "Personal and advertising injury" to mean "injury, including consequential 'bodily injury', arising out of one or more of the following offenses: . . . Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; [and] Oral or written publication, in any manner, of material that violates a person's right of privacy." *Id.* Section V(14)(d), 14(e).

28.     To the extent not waived or otherwise excused, the Insureds have complied with all terms and conditions contained in the New York Marine Policies.  Therefore, the Insureds are entitled to all benefits of the New York Marine Policies.

<u>**NEW YORK MARINE'S BREACHES AND BAD-FAITH CONDUCT**</u>

29.     On April 29, 2025, the Insureds formally notified New York Marine of the *Lively* Lawsuit, requesting that New York Marine honor its duties under the New York Marine Policies.

30.     On May 15, 2025, New York Marine sent a letter denying coverage for the *Lively* Lawsuit despite admitting the *Lively* Lawsuit alleged "conduct that may fall within the definition

1  of 'personal and advertising injury'" and that "the Insuring Agreement in Coverage B appears to
2  apply to the" *Lively* Lawsuit.

3      31.    The Insureds are informed and believe, and on that basis allege, that before it
4  denied coverage, New York Marine did not conduct any meaningful investigation of the *Lively*
5  Lawsuit or the allegations therein, let along the thorough investigation that the law required it to
6  conduct, including "'fully inquir[ing] into possible bases that might support the insured's claim'
7  before denying it."[10]  New York Marine also wrongfully ignored the potential for coverage for the
8  *Lively* Lawsuit, which triggered its duty to defend.  And despite the fact that New York Marine
9  had a duty to defend the Insureds immediately on receiving constructive or actual notice of the
10  *Lively* Lawsuit until such time, if ever, that it could conclusively establish that there was no
11  possibility of coverage, New York Marine never assumed that duty.

12      32.    On July 28, 2025, the Insureds' counsel responded to New York Marine's May 15,
13  2025, letter, explaining why New York Marine was wrong in denying coverage and asking New
14  York Marine to withdraw its denial of coverage, to agree to defend the Insureds, and to pay for the
15  attorneys' fees and costs that the Insureds have incurred, and continue to incur, in defense of the
16  *Lively* Lawsuit.  New York Marine has not assumed its duty to defend.

17      33.    By acting as alleged above, New York Marine has deprived the Insureds of the
18  benefits that they were promised and to which they are entitled under the New York Marine
19  Policies.

20                                    **THE QBE POLICY**

21      34.    QBE issued policy number 130004843 (with a policy period of May 9, 2023, to
22  May 9, 2026) to IEWUM (the "QBE Policy").

23      35.    IEWUM is the "Named Insured" under the QBE Policy.  The QBE Policy insurers
24  all Insureds.

25      36.    Wayfarer is an Insured under the QBE Policy "with respect to Loss on account of a
26  Claim based upon, arising out of or resulting from that part of the Scheduled Media," which is

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[10] *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720-21 (2007).

defined as "[t]he production entitled 'It Ends With Us' including any supplemental Material included in any release of the production produced by the Insured." QBE Policy, Endorsement 3: Additional Insured (Media) Endorsement. The QBE Policy insures Wayfarer "for those Media Activities that occur during the Policy Period." *Id.,* Endorsement 3: Additional Insured (Media) Endorsement (III).

37. The QBE Policy's Media Occurrence Coverage Sub-Part provides for a Limit of Liability of $5,000,000 any one claim and $5,000,000 in the aggregate, subject to a self-insured retention of $25,000 per Claim. *Id.,* Coverage Part Declarations: Item 2(D).

38. The QBE Policy's Media Occurrence Coverage Sub-Part obligates QBE to "pay, on behalf of an Insured, Loss on account of a Claim first made during the Policy Period." *Id.*, Coverage Part I: Insuring Clause.

39. The QBE Policy also obligates QBE to "defend any Claim." *Id.,* General Terms and Conditions VI(A).

40. The QBE Policy defines a "Claim" to include a "civil proceeding . . . against an Insured for a Wrongful Act." *Id.,* Coverage Part V(B)(2).

41. The QBE Policy defines "Wrongful Act" as "any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted by an Insured, or by any other person or entity for which the Insured is legally liable, while engaging in Media Activities" including "defamation (including libel and slander), product disparagement or trade libel or any other tort related to disparagement or harm to character or reputation" and invasion or infringement of or interference with any right of privacy, publicity or private occupancy, public disclosure of any private fact or commercial appropriation of any name, persona or likeness." *Id.,* Media Occurrence Coverage Sub-Part (VI)(F).

42. The QBE Policy defines "Media Activities" as

solely with respect to the Scheduled Media:

1. the researching, investigation, gathering, obtaining, acquiring, developing, preparing compiling or producing of Material, but only if such activities are committed prior

1    to the inception date of the Policy or during the Policy

2    Period;

3    2.  serializing, broadcasting, disseminating, releasing,

4    publishing, distributing, exhibiting, performing, printing

5    or licensing of Material; and

6    3.  any Material created by or on behalf of an Insured to

7    advertise, publicize, promote or sell the Scheduled Media,

8    including any Material created by or on behalf of an

9    Insured for any social media platform.

10   *Id.,* Media Occurrence Coverage Sub-Part (VI)(D).

11   43.    The QBE Policy defines "Material" as "the content of any communication,

12   regardless of its nature or form or the medium by which such content is communicated." *Id.,*

13   Media Occurrence Coverage Sub-Part (VI)(C).

14   44.    The QBE Policy states in its "reporting" condition that QBE "shall not assert that

15   notice of a Claim was untimely unless [it] is materially prejudiced by such untimely notice." *Id.,*

16   Media Occurrence Coverage Sub-Part (V)(A)

17   45.    To the extent not waived or otherwise excused, the Insureds have complied with all

18   terms and conditions contained in the QBE Policy.  Therefore, the Insureds are entitled to all

19   benefits of the QBE Policy.

20   **QBE'S BREACHES AND BAD-FAITH CONDUCT**

21   46.    On April 29, 202 5, the Insureds formally notified QBE of the *Lively* Lawsuit.

22   47.    On May 12, 2025, QBE sent a letter acknowledging receipt of notice of the *Lively*

23   Lawsuit.  QBE represented that it was "in the process of investigating coverage for the claims

24   made against the Insureds in the [*Lively* Lawsuit] under the [QBE Policy]" and "will inform you

25   of our coverage determination under separate cover after we have completed our investigation."

26   48.    On May 29, 2025, QBE sent a letter denying coverage for the *Lively* Lawsuit

27   despite admitting "that the Film meets the definition of Material" under the QBE Policy and that

28   "the allegations of Defamation and False Light Invasion of Privacy potentially allege Wrongful

1  Acts in connection with the content of Material and involving Scheduled Media" under the QBE

2  Policy.  QBE cited various inapplicable exclusions in the QBE Policy.

3        49.      On July 22, 2025, counsel for the Insureds' responded by letter contesting the basis

4  of QBE's coverage denial and demanding that QBE immediately provide a defense to the

5  Insureds.  QBE has not assumed its duty to defend.

6        50.      By acting as alleged above, QBE has deprived the Insureds of the benefits that they

7  were promised and to which they are entitled under the QBE Policy.

8                                **THE LLOYD'S POLICY**

9        51.      The Underwriters issued the Lloyd's Policy to Wayfarer with a policy period of

10  December 6, 2024, to December 6, 2025.  The Lloyd's Policy insures all the Insureds.

11       52.      The Lloyd's Policy "Insuring Clause 1:  Multimedia Liability and Advertising

12  Injury" provides $1,000,000 in insurance, including costs and expenses for its Defamation

13  coverage and $1,000,000 in insurance, including costs and expenses, for its Invasion of Privacy

14  coverage, subject to an aggregate limit of liability of $1,000,000 for all its sections.  Lloyd's

15  Policy, Declarations.

16       53.      The Lloyd's Policy "Insuring Clause 2: Professional Liability" provides $1,000,000

17  in insurance, including costs and expenses for its Errors and Omissions coverage and $1,000,000

18  in insurance, including costs and expenses, for its Breach of Contract coverage, subject to an

19  aggregate limit of liability of $1,000,000 for all its sections.  *Id.*

20       54.      The Lloyd's Policy's Insuring Clause 1 states in its Defamation coverage clause, in

21  relevant part, that the Underwriters will pay all amounts the Insureds are legally obligated to pay

22  "as a result of any claim first made against you during the period . . . arising out of your business

23  activities for any: a. defamation, including but not limited to libel, slander, trade libel, product

24  disparagement, injurious falsehood." *Id.*, Clause 1, Section B.

25       55.      The Lloyd's Policy Insuring Clause 2 states in its Errors and Omissions coverage

26  clause, in relevant part, that the Underwriters will pay all amounts the Insureds, are legally

27  obligated to pay "as a result of any claim first made against you during the period of the policy . . .

28  for any (a) negligent act, error, omission, misstatement or misrepresentation; breach of any

1    contractual term implied by law concerning necessary quality, safety or fitness, or your duty to use

2    reasonable care and skill." *Id.*, Clause 2, Section A.

3         56.    The Lloyd's Policy Insuring Clause 2 states in its Breach of Contract coverage

4    clause, in relevant part, that the Underwriters will pay all amounts the Insureds, are legally

5    obligated to pay "as a direct result of any unintentional breach of a contract with a client for the

6    provision of . . . business activities." Clause 2, Section B.

7         57.    To the extent not waived or otherwise excused, the Insureds have complied with all

8    terms and conditions contained in the Lloyd's Policy.

9         58.    Therefore, the Insureds are entitled to all benefits of the Lloyd's Policy.

10    <u>**THE UNDERWRITERS' BREACHES AND BAD FAITH CONDUCT**</u>

11         59.    On April 29, 2025, the Insureds formally notified the Underwriters of the *Lively*

12    Lawsuit.

13         60.    On June 12, 2025, the Underwriters sent a letter disclaiming coverage of the *Lively*

14    Lawsuit, ignoring that there was a potential for coverage under the Lloyd's Policy.  The

15    Underwriters stated, "The limited information provided to Underwriters does not reflect that the

16    allegations against the Wayfarer parties arise from the *Man Enough* podcast or its related content."

17    They did so despite express allegations in the *Lively* First Amended Complaint that the podcast

18    was an essential part of the Scenario Planning document embodying a strategy to "advance

19    misleading counternarratives" against Ms. Lively.  Furthermore, the Insureds are informed and

20    believe, and on that basis allege, that the Underwriters conducted no meaningful investigation

21    before denying coverage, let alone the thorough investigation that they were legally obligated to

22    conduct.  Had the Underwriters done a more appropriate investigation, they readily would have

23    discovered that the *Man Enough* podcast is mentioned more than 20 times in the *Lively* First

24    Amended Complaint and more than 20 times in stories in the media about the *Lively* Lawsuit.

25         61.    On July 28, 2025, counsel for the Insureds sent a letter explaining why the

26    Underwriters had breached their duties, were wrong in not defending the Insureds, and in denying

27    coverage.

28         62.    The Underwriters have not assumed their duty to defend the Insureds.

63.     By acted as alleged above, the Underwriters have deprived the Insureds of the benefits that they were promised and to which they are entitled under the Lloyd's Policy.

### FIRST CAUSE OF ACTION

### Breach of Contract against New York Marine

64.     The Insureds reallege and incorporate by reference paragraphs 1 through 33 above.

65.     By acting as alleged above, including by failing and refusing to defend the Insureds, and by denying coverage, New York Marine has breached its duties under the New York Marine Policies and the law.

66.     As a direct and proximate result of New York Marine's breaches, the Insureds have sustained, and continue to sustain, damages in excess of $1,000,000 in an amount to be proven at trial above, plus interest.

### SECOND CAUSE OF ACTION

### Breach of Contract against QBE

67.     The Insureds reallege and incorporate by reference paragraphs 1 through 22 and 34 through 50 above.

68.     By acting as alleged above, including by failing and refusing to defend the Insureds, and by denying coverage, QBE has breached its duties under the QBE Policy and the law.

69.     As a direct and proximate result of QBE's breaches, the Insureds, have sustained, and continue to sustain, in excess of $1,000,000 in damages in an amount to be proven at trial above, plus interest.

### THIRD CAUSE OF ACTION

### Breach of Contract against the Underwriters

70.     The Insureds reallege and incorporate by reference paragraphs 1 through 22 and 51 through 63 above.

71.     By acting as alleged above, including by failing and refusing to defend the Insureds, and by denying coverage, the Underwriters have breached their duties under the Lloyd's Policy and under the law.

72.    As a direct and proximate result of the Underwriters' breaches, the Insureds have sustained, and continue to sustain, in excess of $1,000,000 in damages in an amount to be proven at trial above, plus interest.

## FOURTH CAUSE OF ACTION

### Bad Faith against New York Marine

73.    The Insureds reallege and incorporate by reference paragraphs 1 through 33 and 64 through 66 above.

74.    Implied in the New York Marine Policies is a covenant that New York Marine would act in good faith and deal fairly with the Insureds, that New York Marine would not interfere with the rights of the Insureds to receive benefits due under the policies, and that New York Marine would give at least the same level of consideration to the Insureds' interests as it gave its own interests.

75.    New York Marine also had a duty under the polices, the law, and insurance industry custom, practice, and standards to honor the terms of insurance promised under the policies.

76.    Instead of complying with these duties, New York Marine acted in bad faith, by, among other things,

- failing to promptly conduct a full and thorough investigation of the bases that would support the Insureds' claim for coverage;
- unreasonably failing and refusing to honor its promises and representations in the Policies;
-  unreasonably refusing to pay the full amount due under the Policies;
- putting its interests above those of the Insureds; and
- otherwise acting as alleged above.

77.    In breach of the implied covenant of good faith and fair dealing, New York Marine did these things and committed the acts alleged above for the purpose of consciously withholding from the Insureds the rights and benefits which they were, and are, entitled to under the Policies.

78.    New York Marine's acts are inconsistent with the reasonable expectations of the Insureds, are contrary to the express and implied terms of the Policies and constitute bad faith.

79.    As a direct and proximate result of New York Marine's breach of the implied covenant of good faith and fair dealing, the Insureds have sustained, and continue to sustain, damages in an amount to be proven at trial.  The Insureds are also entitled to recover all attorneys' fees that were reasonably incurred, and continue to incur, in their efforts to obtain the benefits due under the Policies that New York Marine wrongfully withheld, and is withholding, in bad faith. The Insureds are further entitled to interest thereon at the maximum legal rate.  The Insureds continue to suffer damages because of New York Marine's bad faith.

80.    The Insureds are informed and believe, and on that basis allege, that New York Marine—acting through one or more of its directors, officers, managing agents, or other corporate employees with substantial independent discretionary authority over significant aspects of New York Marine's business—performed, authorized, and/or ratified the bad faith conduct alleged above.

81.    New York Marine's conduct is contemptible and has been done with a conscious disregard of the Insureds' rights, constituting oppression, fraud, and/or malice.  New York Marine has engaged in a series of acts designed to deny the Insureds the benefits due under the New York Marine Policies.  Specifically, New York Marine, by acting as alleged above, consciously disregarded the Insureds' rights and forced them to incur substantial financial losses, thereby inflicting substantial financial damage.  New York Marine ignored the Insureds' interests and concerns with the requisite intent to injure under California Civil Code section 3294.  The Insureds are therefore entitled to recover punitive damages from New York Marine in an amount sufficient to punish New York Marine and to deter similar conduct in the future.

## FIFTH CAUSE OF ACTION

### Bad Faith against QBE

82.    The Insureds reallege and incorporate by reference paragraphs 1 through 22 and 34 through 50, and 67 through 69 above.

17
**COMPLAINT**

83.    Implied in the QBE Policy is a covenant that QBE would act in good faith and deal fairly with the Insureds, that QBE would not interfere with the rights of the Insureds to receive benefits due under the QBE Policy, and that QBE would give at least the same level of consideration to the Insureds' interests as it gave its own interests.

84.    QBE also had a duty under the QBE Policy, the law, and insurance industry custom, practice, and standards to honor the terms of insurance promised under the policy.

85.    Instead of complying with these duties, QBE acted in bad faith, by, among other things,

- failing to promptly conduct a full and thorough investigation of the bases that would support the Insureds' claim for coverage; unreasonably failing and refusing to honor its promises and representations in the QBE Policy;

- unreasonably refusing to pay the full amount due under the QBE Policy;

- putting its interests above those of the Insureds; and

- otherwise acting as alleged above.

86.    In breach of the implied covenant of good faith and fair dealing, QBE did these things and committed the acts alleged above for the purpose of consciously withholding from the Insureds the rights and benefits which they were, and are, entitled to under the QBE Policy.

87.    QBE's acts are inconsistent with the reasonable expectations of the Insureds, are contrary to the express and implied terms of the QBE Policy and constitute bad faith.

88.    As a direct and proximate result of QBE's breach of the implied covenant of good faith and fair dealing, the Insureds have sustained, and continue to sustain, damages in an amount to be proven at trial.  The Insureds are also entitled to recover all attorneys' fees that were reasonably incurred, and continue to incur, in their efforts to obtain the benefits due under the QBE Policy that QBE wrongfully withheld, and is withholding, in bad faith.  The Insureds are further entitled to interest thereon at the maximum legal rate.  The Insureds continue to suffer damages because of QBE's bad faith.

89.    The Insureds are informed and believe, and on that basis allege, QBE—acting through one or more of its directors, officers, managing agents, or other corporate employees with

1  substantial independent discretionary authority over significant aspects of QBE's business—

2  performed, authorized, and/or ratified the bad faith conduct alleged above.

3     90.    QBE's conduct is contemptible and has been done with a conscious disregard of the

4  Insureds' rights, constituting oppression, fraud, and/or malice.  QBE has engaged in a series of

5  acts designed to deny the Insureds the benefits due under the QBE Policy.  Specifically, QBE, by

6  acting as alleged above, consciously disregarded the Insureds' rights and forced the Insureds to

7  incur substantial financial losses, thereby inflicting substantial financial damage.  QBE ignored the

8  Insureds' interests and concerns with the requisite intent to injure under California Civil Code

9  section 3294.  The Insureds are therefore entitled to recover punitive damages from QBE in an

10  amount sufficient to punish QBE and to deter similar conduct in the future.

11                          **SIXTH CAUSE OF ACTION**

12                     **Bad Faith against the Underwriters**

13     91.    The Insureds reallege and incorporate by reference paragraphs 1 through 22, 51

14  through 63, and 70 through 72 above.

15     92.    Implied in the Lloyd's Policy is a covenant that the Underwriters would act in good

16  faith and deal fairly with the Insureds, that the Underwriters would not interfere with the rights of

17  the Insureds to receive benefits due under the Lloyd's Policy, and that the Underwriters would

18  give at least the same level of consideration to the Insureds' interests as they gave their own

19  interests.

20     93.    The Underwriters also had a duty under the Lloyd's Policy, the law, and insurance

21  industry custom, practice, and standards to honor the terms of insurance promised under the

22  Lloyd's Policy.

23     94.    Instead of complying with these duties, the Underwriters acted in bad faith, by,

24  among other things,

25     •      failing to promptly conduct a full and thorough investigation of the bases that

26            would support the Insureds' claim for coverage;

27     •      unreasonably failing and refusing to honor its promises and representations in the

28            Lloyd's Policy;

1    •    unreasonably refusing to defend the Insureds in the *Lively* Lawsuit;

2    •    putting its interests above those of the Insureds; and

3    •    otherwise acting as alleged above.

4    95.    In breach of the implied covenant of good faith and fair dealing, the Underwriters

5    did these things and committed the acts alleged above for the purpose of consciously withholding

6    from the Insureds the rights and benefits there were, and are, entitled to under the Lloyd's Policy.

7    96.    The Underwriters' acts are inconsistent with the reasonable expectations of the

8    Insureds, are contrary to the express and implied terms of the Lloyd's Policy, and constitute bad

9    faith.

10    97.    As a direct and proximate result of the Underwriters' breach of the implied

11    covenant of good faith and fair dealing, the Insureds have sustained, and continue to sustain,

12    damages in an amount to be proven at trial.  The Insureds are also entitled to recover all attorneys'

13    fees that were reasonably incurred, and continue to incur, in their efforts to obtain the benefits due

14    under the Lloyd's Policy that the Underwriters wrongfully withheld, and are withholding, in bad

15    faith.  The Insureds are further entitled to interest thereon at the maximum legal rate.  The Insureds

16    continue to suffer damages because of the Underwriters' bad faith.

17    98.    The Insureds are informed and believe, and on that basis allege, that the

18    Underwriters —acting through one or more of their directors, officers, managing agents,

19    representatives, or employees with substantial independent discretionary authority over significant

20    aspects of their business—performed, authorized, and/or ratified the bad faith conduct alleged

21    above.

22    99.    The Underwriters' conduct is contemptible and has been done with a conscious

23    disregard of the Insureds' rights, constituting oppression, fraud, and/or malice.  The Underwriters

24    have engaged in a series of acts designed to deny the Insureds the benefits due under the Lloyd's

25    Policy.  Specifically, the Underwriters, by acting as alleged above, consciously disregarded the

26    Insureds' rights and forced the Insureds to incur substantial financial losses, thereby inflicting

27    substantial financial damage.  The Underwriters ignored the Insureds' interests and concerns with

28    the requisite intent to injure under California Civil Code section 3294.  The Insureds are therefore

1  entitled to recover punitive damages from the Underwriters in an amount sufficient to punish the

2  Underwriters and to deter similar conduct in the future.

3  **SEVENTH CAUSE OF ACTION**

4  **Declaratory Relief against New York Marine**

5  100.    The Insureds reallege and incorporate by reference paragraphs 1 through 33, 64

6  through 66, and 73 through 81 above.

7  101.    Pursuant to the terms of the New York Marine Policies, New York Marine is

8  obligated to defend the Insureds in the *Lively* Lawsuit at least until such time as all applicable

9  limits of liability in the New York Marine Policies are fully exhausted by payment of damages.

10  102.    New York Marine disputes and denies that it has any duty to defend any of the

11  Insureds in the *Lively* Lawsuit.

12  103.    The Insureds will be deprived of the benefit of New York Marine's promise and

13  duty to defend, one of the most important benefits promised under the New York Marine policies,

14  unless their dispute with New York Marine over New York Marine's duty to defend is resolved.

15  104.    Resolution of these controversies will establish the Insureds the defense to which

16  they are entitled under the New York Marine Policies.

17  105.    The Insureds seek a judicial declaration by this Court in accord with their

18  contentions, rejecting the New York Marine's contentions and stating that New York Marine has a

19  duty to defend the Insureds in the *Lively* Lawsuit.

20  106.    A declaration is necessary at this time in order that the parties' dispute may be

21  resolved and that they may be aware of their prospective rights and duties.

22  **EIGHTH CAUSE OF ACTION**

23  **Declaratory Relief Against QBE**

24  107.    The Insureds reallege and incorporate by reference paragraphs 1 through 22 and 34

25  through 50, 67 through 69 above, and 82 through 90 above.

26  108.    Pursuant to the terms of the QBE Policy, QBE is obligated to defend the Insureds

27  in the *Lively* Lawsuit at least until such time as all applicable limits of liability in the QBE Policy

28  are fully exhausted.

109.    QBE disputes and denies that it has any duty to defend any of the Insureds in the *Lively* Lawsuit.

110.    The Insureds will be deprived of the benefit of QBE's promise and duty to defend, one of the most important benefits promised under the QBE Policy, unless their dispute with QBE's duty to defend is resolved.

111.    Resolution of these controversies will establish the Insureds' right to the defense to which they are entitled under the QBE Policy.

112.    The Insureds seek a judicial declaration by this Court in accord with their contentions, rejecting QBE's contentions and stating that QBE has a duty to defend the Insureds in the *Lively* Lawsuit.

113.    A declaration is necessary at this time in order that the parties' dispute may be resolved and that they may be aware of their prospective rights and duties.

### NINTH CAUSE OF ACTION

### Declaratory Relief Against the Underwriters

114.    The Insureds reallege and incorporate by reference paragraphs 1 through 22, 51 through 63, 70 through 72, and 91 through 99 above.

115.    Pursuant to the terms of the Lloyd's Policy, the Underwriters are obligated to defend the Insureds in the *Lively* Lawsuit at least until such time as all applicable limits of liability in the Lloyd's Policy are fully exhausted.

116.    The Underwriters dispute and deny that they have any duty to defend any of the Insureds in the *Lively* Lawsuit.

117.    The Insureds will be deprived of the benefit of the Underwriters' promise and duty to defend, one of the most important benefits promised under the Lloyd's Policy, unless their dispute with the Underwriters over the Underwriters' duty to defend is resolved.

118.    Resolution of these controversies will establish the Insureds' right to the defense to which they are entitled under the Lloyd's Policy.

**COMPLAINT**

119.    The Insureds seek a judicial declaration by this Court in accord with their contentions, rejecting the Underwriters' contentions and stating that the Underwriters have a duty to defend the Insureds in the *Lively* Lawsuit.

120.    A declaration is necessary at this time in order that the parties' dispute may be resolved and that they may be aware of their prospective rights and duties.

## PRAYER FOR RELIEF

WHEREFORE, the Insureds pray for relief as follows:

### ON THE FIRST CAUSE OF ACTION

1.    For damages, plus interest, according to proof at the time of trial;

### ON THE SECOND CAUSE OF ACTION

2.    For damages, plus interest, according to proof at the time of trial;

### ON THE THIRD CAUSE OF ACTION

3.    For damages, plus interest, according to proof at the time of trial;

### ON THE FOURTH CAUSE OF ACTION

4.    For damages, including attorneys' fees, plus interest, according to proof at time of trial;

5.    For punitive damages according to proof at the time of trial;

### ON THE FIFTH CAUSE OF ACTION

6.    For damages, including attorneys' fees, plus interest, according to proof at time of trial;

7.    For punitive damages according to proof at the time of trial;

### ON THE SIXTH CAUSE OF ACTION

8.    For damages, including attorneys' fees, plus interest, according to proof at time of trial;

9.    For punitive damages according to proof at the time of trial;

1

## ON THE SEVENTH CAUSE OF ACTION

2    10.    For a declaratory judgment in favor of the Insureds and against New York Marine,

3 in accord with the Insureds' contentions above, and declaring that New York Marine is required to

4 defend the Insureds in the *Lively* Lawsuit.

5

## ON THE EIGHTH CAUSE OF ACTION

6    11.    For a declaratory judgment in favor of the Insureds and against QBE, in accord

7 with the Insureds' contentions above, and declaring that QBE is required to defend the Insureds in

8 the *Lively* Lawsuit.

9

## ON THE NINTH CAUSE OF ACTION

10    12.    For a declaratory judgment in favor of the Insureds and against the Underwriters, in

11 accord with the Insureds' contentions above, and declaring that the Underwriters are required to

12 defend the Insureds in the *Lively* Lawsuit.

13

## ON ALL CAUSES OF ACTION

14    13.    For costs of suit herein; and

15    14.    For such other, further, and/or different relief as may be deemed just and proper.

16 DATED:  July 30, 2025                McGUIREWOODS LLP

17

                                By:  _____

18                                     Eliza J. Logan

19                                     Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

**COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Plaintiffs Wayfarer Studios LLC, It Ends With Us Movie LLC, Justin Baldoni, Jamey Heath, and Steve Sarowitz hereby demand a trial by jury in this action.

DATED:  July 30, 2025                    McGUIREWOODS LLP

By: _____
Eliza J. Logan

Attorneys for Plaintiffs

**COMPLAINT**